**WEST ORANGE–COVE CONSOLIDATED I.S.D. et al., Petitioners,**

v.

**Felipe ALANIS, in his official capacity as the Commissioner of Education, et al., Respondents.**

No. 02–0427.

Supreme Court of Texas.

Argued March 27, 2003.

Decided May 29, 2003.

Haynes & Boone, L.L.P., Nina Cortell, Carrie L. Huff and Charles G. Orr, Dallas, W. Wade Porter, Austin, Mark Ryan Trachtenberg, Houston, and George W. Bramblett, Jr., Dallas, for Petitioner.

Greg Abbott, Atty. Gen. of Texas, Andy Taylor, First Asst. Atty. Gen., Jeffrey S. Boyd, Office of the Atty. Gen., Toni Hunter, Office of Atty. Gen. of Texas, Julie Caruthers Parsley, Office of the Solicitor Gen. of Texas, Barry Ross McBee, Office of the Attorney Gen., Rafael Edward Cruz, Office of the Atty. Gen., Austin, Randall Buck Wood, Doug W. Ray, Ray Wood & Bonilla LLP, Austin, Leticia Marie Saucedo, Nina Perales, Selena Norah Solis, Albert H. Kauffman, Joseph Berra, Mexican American Legal Defense (MALDEF), San Antonio, for Respondent.

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice O'NEILL, Justice JEFFERSON, Justice SCHNEIDER, and Justice WAINWRIGHT joined.

Article VIII, section 1–e of the Texas Constitution states: "No State ad valorem taxes shall be levied upon any property within this State."[1] We have held that "[a]n ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the [taxing] authority employed is without meaningful discretion."[2]

The maintenance and operation of Texas public schools are funded mostly by ad valorem taxes levied by local school districts under comprehensive state regulation that, among other things, caps the rates at which districts can tax and redistributes local revenue among districts. In 1995, we held that the State's control of this school funding system had not made local property taxes an unconstitutional state tax because school districts retained meaningful discretion in generating revenue, but we foresaw a day when increasing costs of education and evolving circumstances might force local taxation at maximum rates.[3] At that point, we said, the conclusion that a state property tax had been levied would be "unavoidable".[4]

In the case before us, four plaintiff school districts allege that that day has come. Specifically, they contend that they and other districts have been forced to tax at maximum rates set by statute in order to educate their students. These taxes, they say, have become indistinguishable from a state ad valorem tax prohibited by article VIII, section 1–e.

The district court dismissed the case on the pleadings, holding that a constitutional violation could not be alleged because far fewer than half of Texas' 1,035 school districts were taxing at the maximum rates allowed. The court of appeals affirmed, focusing not on how many districts were taxing at maximum rates but on whether any of them were forced to do so just to provide an accredited education as defined

---

1. TEX. CONST. art. VIII, § 1–e.

2. *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 502 (Tex.1992) [*Edgewood III*].

3. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 738 (Tex.1995) [*Edgewood IV*].

4. *Id.*

by statute.[5] We disagree with both courts and therefore reverse and remand the case to the trial court for further proceedings.

## I

■■■ This is the fifth in a series of cases to come before us challenging the constitutionality of the Texas public school finance system on various grounds.[6] Central to some of the cases and basic to them all is article VII, section 1 of the Texas Constitution, which states:

A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.[7]

By assigning to the Legislature a duty, this section both empowers and obligates. It gives to the Legislature the sole authority to set the policies and fashion the means for providing a public school system.[8] Thus we have said that "[w]e do not prescribe the means which the Legislature must employ in fulfilling its duty."[9] But the provision also requires the Legislature to meet three standards. First, the education provided must be adequate; that is, the public school system must accomplish that "general diffusion of knowledge ... essential to the preservation of the liberties and rights of the people". Second, the means adopted must be "suitable". Third, the system itself must be "efficient". "[T]hese are admittedly not precise terms," as we have acknowledged, but "they do provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions."[10] The final authority to determine adherence to the Constitution resides with the Judiciary.[11] Thus, the

---

5. 78 S.W.3d 529 (Tex.App.-Austin 2002).

6. *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989) [*Edgewood I*]; *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex.1991) [*Edgewood II*]; *Edgewood III*, *supra* note 2; *Edgewood IV*, *supra* note 3.

7. TEX. CONST. art. VII, § 1.

8. *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 36 (1931) ("Since the Legislature has the mandatory duty to make suitable provision for the support and maintenance of an efficient system of public free schools, and has the power to pass any law relative thereto, not prohibited by the Constitution, it necessarily follows that it has a choice in the selection of methods by which the object of the organic law may be effectuated. The Legislature alone is to judge what means are necessary and appropriate for a purpose which the Constitution makes legitimate.").

9. *Edgewood II*, 804 S.W.2d at 498.

10. *Edgewood I*, 777 S.W.2d at 394; *accord Edgewood IV*, 917 S.W.2d at 736.

11. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–178, 2 L.Ed. 60 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? ... So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide the case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."); *Love v. Wilcox*, 119 Tex. 256, 28 S.W.2d 515, 520 (1930) ("Since *Marbury v. Madison*, [5 U.S. (1 Cranch) 137, 166–167 (1803)], the courts of last resort of the several states have almost universally followed the opinion of Chief Justice Marshall to the effect that it is clear that: 'Where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, ... the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.' ").

Legislature has the sole right to decide *how* to meet the standards set by the people in article VII, section 1, and the Judiciary has the final authority to determine *whether* they have been met.[12]

In 1989, we decided *Edgewood I*, the first case challenging the constitutionality of the public school finance system under article VII, section 1. The system's principal component for funding maintenance and operations was the Foundation School Program, a two-tiered mechanism that the Legislature had set up in 1975.[13] The first tier was designed to fund a basic education.[14] Every school district that could not, by taxing at a specified minimum rate, generate a certain level of revenue per student in "weighted average daily attendance" ("WADA"—weighted by taking into account special needs and conditions such as special or bilingual education) was given state funds to make up the difference.[15]

Despite its stated purpose, first-tier funding did not cover the cost of meeting bare educational requirements mandated by the Legislature.[16] The system's second tier provided state funds to guarantee a certain level of additional revenue per student in WADA for each penny a school district increased its tax rate above the prescribed minimum.[17] School district tax rates were capped at $1.50 per $100 property valuation[18] as they had been for decades.[19] Smaller components of the school finance system were the Available School Fund established by the Constitution,[20] which provided all school districts about $300 per student,[21] and federal funding.[22] Facilities and other expenses were funded separately.[23]

Then, as now, local ad valorem taxes supplied more than half the funding for public schools,[24] the tax bases of the more than 1,000 school districts, and conse-

---

12. *Edgewood IV*, 917 S.W.2d at 726 ("This Court's role under our Constitution's separation of powers provision should be one of restraint. We do not dictate to the Legislature how to discharge its duty. As prominent as this Court's role has been in recent years on this important issue, it is subsidiary to the constitutionally conferred role of the Legislature. The people of Texas have themselves set the standard for their schools. Our responsibility is to decide whether that standard has been satisfied, not to judge the wisdom of the policy choices of the Legislature, or to impose a different policy of our own choosing.").

13. *Edgewood I*, 777 S.W.2d at 392; *Edgewood II*, 804 S.W.2d at 495; *Edgewood III*, 826 S.W.2d at 496; Texas Legislative Budget Board, Financing Public Education in Texas Kindergarten Through Grade 12 Legislative Primer at 25–26 (2d ed.2000) [hereinafter LBB Primer].

14. *Edgewood II*, 804 S.W.2d at 495.

15. *Id.*

16. *Edgewood I*, 777 S.W.2d at 392.

17. *Edgewood II*, 804 S.W.2d at 495.

18. Act of June 2, 1969, 61st Leg., R.S., ch. 889, § 1, 1969 Tex. Gen. Laws 2735, 2895–2896.

19. *See* Act of May 17, 1945, 49th Leg., R.S., ch. 304, § 1, 1945 Tex. Gen. Laws 488.

20. Tex. Const. art. VII, § 5(a) ("The principal of all bonds and other funds, and the principal arising from the sale of lands hereinbefore set apart to said school fund, shall be the permanent school fund, and all the interest derivable therefrom and the taxes herein authorized and levied shall be the available school fund. The available school fund shall be applied annually to the support of the free public schools.").

21. *Edgewood II*, 804 S.W.2d at 495 n. 10.

22. *Edgewood I*, 777 S.W.2d at 392.

23. *Id.*

24. *Id.* ("Of total education costs, the state provides about forty-two percent, school districts provide about fifty percent, and the remainder comes from various other sources

quently the tax revenue available to them, were vastly different,[25] and state tax revenues were inadequate to level local funding disparities.[26] At that time, local tax revenues were not redistributed among school districts as they are now. We described the situation thus:

> There are glaring disparities in the abilities of the various school districts to raise revenues from property taxes because taxable property wealth varies greatly from district to district. The wealthiest district has over $14,000,000 of property wealth per student, while the poorest has approximately $20,000; this disparity reflects a 700 to 1 ratio. The 300,000 students in the lowest-wealth schools have less than 3% of the state's property wealth to support their education while the 300,000 students in the highest-wealth schools have over 25% of the state's property wealth; thus the 300,000 students in the wealthiest districts have more than eight times the property value to support their education as the 300,000 students in the poorest districts. The average property wealth in the 100 wealthiest districts is more than twenty times greater than the average property wealth in the 100 poorest districts....

> \* \* \*

> Because of the disparities in district property wealth, spending per student varies widely, ranging from $2,112 to $19,333. Under the existing system, an average of $2,000 more per year is spent on each of the 150,000 students in the wealthiest districts than is spent on the 150,000 students in the poorest districts.

> The lower expenditures in the property-poor districts are not the result of lack of tax effort. Generally, the property-rich districts can tax low and spend high while the property-poor districts must tax high merely to spend low. In 1985–86, local tax rates ranged from $.09 to $1.55 per $100 valuation. The 100 poorest districts had an average tax rate of 74.5 cents and spent an average of $2,978 per student. The 100 wealthiest districts had an average tax rate of 47 cents and spent an average of $7,233 per student.... A person owning an $80,000 home with no homestead exemption would pay $1,206 in taxes in the east Texas low-wealth district of Leveretts Chapel, but would pay only $59 in the west Texas high-wealth district of Iraan–Sheffield. Many districts have become tax havens.[27]

The plaintiffs in *Edgewood I* asserted that this public school finance system was not efficient within the meaning of article VII, section 1. " 'Efficient,' " we said, "conveys the meaning of effective or productive

including federal funds."); *see* LBB PRIMER, *supra* note 13, at 1 ("For the 2000–01 biennium, state taxes are estimated to generate approximately 44 percent of the total funds and local school district property taxes 47.5 percent of the total. The federal government provides approximately 8.5 percent of the revenue, most of it earmarked for specific federal education programs.").

25. *Edgewood I*, 777 S.W.2d at 392–393; LBB PRIMER, *supra* note 13, at 6 (stating, as of 2000: "There are 1,035 school districts in the state. The tax base among these districts varies considerably. Kenedy County Wide ISD has more than $3 million in property wealth per enrolled student, while Boles ISD has less than $10,000 in property wealth per enrolled student.").

26. *Edgewood I*, 777 S.W.2d at 392; *see* LBB PRIMER, *supra* note 13, at 21 (stating, as of 2000: "The number of districts subject to the recapture provisions range from 85 to 100 in a given year. The associated recapture revenue is anticipated to total $949.8 million in the 2000–01 biennium.").

27. *Edgewood I*, 777 S.W.2d at 392–393.

of results and connotes the use of resources so as to produce results with little waste; this meaning does not appear to have changed over time."[28] Given these circumstances, a unanimous Court had little difficulty concluding that the constitutional standard of efficiency had not been met:

> We hold that the state's school financing system is neither financially efficient nor efficient in the sense of providing for a "general diffusion of knowledge" statewide, and therefore that it violates article VII, section 1 of the Texas Constitution. Efficiency does not require a per capita distribution, but it also does not allow concentrations of resources in property-rich school districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards. There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort. Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds. Certainly, this much is required if the state is to educate its populace efficiently and provide for a general diffusion of knowledge statewide.[29]

Because constitutional efficiency does not require absolute equality of spending, we expressly acknowledged that "local communities would [not] be precluded from supplementing an efficient system es-tablished by the legislature", but we added that "any local enrichment must derive solely from local tax effort."[30] In other words, the constitutional standard of efficiency requires substantially equivalent access to revenue only up to a point, after which a local community can elect higher taxes to "supplement" and "enrich" its own schools. That point, of course, although we did not expressly say so in *Edgewood I*, is the achievement of an adequate school system as required by the Constitution. Once the Legislature has discharged its duty to provide an adequate school system for the State, a local district is free to provide enhanced public education opportunities if its residents vote to tax themselves at higher levels. The requirement of efficiency does not preclude local supplementation of schools. Although we were not called upon in *Edgewood I* to consider what constitutional adequacy entails, the interrelationship between the standards of adequacy and efficiency was fundamental to our reasoning in that case.

We ordered that state funding of public schools cease on May 1, 1990, unless the Legislature conformed the system to meet constitutional standards.[31] Although we expressly did not "instruct the legislature as to the specifics of the legislation it should enact ... or order it to raise taxes,"[32] we cautioned that "[a] band-aid will not suffice; the system itself must be changed."[33] Eight months later, in a sixth special session, the Legislature adjusted the system to provide incentives it believed would "achieve substantial equity among the districts that educate 95% of our stu-

---

28. *Id.* at 395 (citations omitted).

29. *Id.* at 397.

30. *Id.* at 398.

31. *Id.* at 399; *accord Edgewood II*, 804 S.W.2d at 493.

32. *Edgewood I*, 777 S.W.2d at 399.

33. *Id.* at 397.

dents."[34] The plaintiffs in *Edgewood I* immediately challenged this legislation, Senate Bill 1, again on the ground that the system was not efficient within the meaning of article VII, section 1 of the Constitution. Without attempting to determine whether the incentives added by Senate Bill 1 could realistically reach their goals, we concluded in *Edgewood II* that the system as a whole remained constitutionally inefficient:

Even if the approach of Senate Bill 1 produces a more equitable utilization of state educational dollars, it does not remedy the major causes of the wide opportunity gaps between rich and poor districts. It does not change the boundaries of any of the current 1052 school districts, the wealthiest of which continues to draw funds from a tax base roughly 450 times greater per weighted pupil than the poorest district. It does not change the basic funding allocation, with approximately half of all education funds coming from local property taxes rather than state revenue. And it makes no attempt to equalize access to funds among all districts. By limiting the funding formula to districts in which 95% of the students attend school, the Legislature excluded 132 districts which educate approximately 170,000 students and harbor about 15% of the property wealth in the state. A third of our students attend school in the poorest districts which also have about 15% of the property wealth in the state. Consequently, after Senate Bill 1, the 170,000 students in the wealthiest districts are still supported by local revenues drawn from the same tax base as the 1,000,000 students in the poorest districts.

These factors compel the conclusion as a matter of law that the State has made an unconstitutionally inefficient use of its resources. The fundamental flaw of Senate Bill 1 lies not in any particular provisions but in its overall failure to restructure the system.[35]

We reaffirmed that efficiency did not preclude local supplementation of school funding.[36] On rehearing, we stressed:

The current system remains unconstitutional not because *any* unequalized local supplementation is employed, but because the State relies so heavily on unequalized local funding in attempting to discharge its duty to "make suitable provision for the support and maintenance of an efficient system of public free schools." Once the Legislature provides an efficient system in compliance with article VII, section 1, it may, so long as efficiency is maintained, authorize local school districts to supplement their educational resources if local property owners approve an additional local property tax.[37]

Because the Legislature was then in session, we required that it respond without delay, and it promptly enacted Senate Bill 351.[38] The legislation created 188 new "county education districts". In most instances, a CED comprised the school districts in a single county.[39] The sole pur-

---

34. *Edgewood II*, 804 S.W.2d at 495.

35. *Id.* at 496.

36. *Id.* at 495 n. 11 ("The question of local enrichment continues to be controlled by this Court's opinion in *Edgewood I*, 777 S.W.2d at 397–98.").

37. *Id.* at 500 (emphasis in original) (citation and footnotes omitted).

38. *Edgewood III*, 826 S.W.2d at 492.

39. *Id.* at 498.

pose of the CEDs was to levy, collect, and distribute property taxes among their component school districts, respectively, in effect consolidating school districts' tax bases while leaving them in control of their own schools.[40] CED tax rates and distributions were prescribed by statute to ensure uniformity. This state-controlled tax-base consolidation "reduced the geographical disparities in the availability of revenue for education"[41] and was not challenged as failing to satisfy the efficiency standard of article VII, section 1. It was, however, challenged as imposing a state ad valorem tax in violation of article VIII, section 1–e of the Constitution. We sustained that challenge in *Edgewood III:*

> Senate Bill 351 mandates the tax CEDs levy. No CED may decline to levy the tax. The tax rate for all CEDs is predetermined by Senate Bill 351. No CED can tax at a higher rate or a lower rate under any circumstances. Indeed, the very purpose of the CEDs is to levy a uniform tax statewide. The distribution of the proceeds is set by Senate Bill 351. No CED has any discretion to distribute tax proceeds in any manner except as required by statute. Every function of the CEDs is purely ministerial. If the State mandates that a tax be levied, sets the rate, and prescribes the distribution of the proceeds, the tax is a state tax, regardless of the instrumentality which the State may choose to use.[42]

To place the situation created by Senate Bill 351 in the broader context of the constitutional prohibition of state ad valorem tax, we explained:

> An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion. How far the State can go toward encouraging a local taxing authority to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities. If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e. It is difficult, perhaps impossible, to define for every conceivable hypothetical precisely where along this continuum such taxes become state taxes. Therefore, if the Legislature, in an effort to remedy Senate Bill 351 with as few changes as possible, chose to inject some additional element of leeway in the assessment of the CED tax, it is impossible to say in advance whether that element would remove the tax from the prohibition of article VIII, section 1–e. Each case must necessarily turn on its own particulars. Although parsing the differences may be likened to dancing on the head of a pin, it is the Legis-

---

40. *Id.*

41. *Id.* at 500.

42. *Id.* (citation and footnote omitted).

lature which has created the pin, summoned the dancers, and called the tune. The Legislature can avoid these constitutional conundra by choosing another path altogether.[43]

We also held that by levying a tax without an election, the CEDs violated article VII, section 3(e) of the Constitution.[44]

We delayed enforcement of our ruling for more than a year, until the end of the next regular session of the Legislature in 1993.[45] During that session, the Legislature's first reaction was to attempt to amend the Constitution. A proposed amendment that would have rewritten article VII, section 1 to remove its standards and commit the responsibility for public education to local school districts was introduced but not reported out of committee.[46] A proposed amendment that would have authorized the system structured by

Senate Bill 351 passed the Senate and narrowly passed the House[47] but was soundly defeated by the people before the session ended.[48] The Legislature then enacted Senate Bill 7.[49]

Senate Bill 7 returned to the two-tiered Foundation School Program,[50] the basic structure of which remains in place today.[51] As before, "[t]he stated purpose of Tier 1 is to guarantee 'sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards.'"[52] At a minimum $0.86 tax rate, a school district that cannot generate revenue equal to a "basic allotment" per student in WADA—in 1993, $2,300,[53] and today, $2,537,[54] subject to various adjustments[55]—receives state funds for the difference.[56] As before, the basic allotment does not cover the cost of an education that meets legislated ac-

43. *Id.* at 502–503.

44. *Id.* at 506; *see* TEX. CONST. art. VII, § 3(e) ("The Legislature shall be authorized to pass laws for the assessment and collection of taxes in all school districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties, and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts for the further maintenance of public free schools, and for the erection and equipment of school buildings therein; provided that a majority of the qualified voters of the district voting at an election to be held for that purpose, shall approve the tax.").

45. *Edgewood III*, 826 S.W.2d at 522–523.

46. Tex. H.J. Res. 10, H.J. of Tex., 73rd Leg., R.S. 184 (1993).

47. Tex. S.J. Res. 7, 73rd Leg., R.S., 1993 Tex. Gen. Laws 5560 (passed Senate 27–4 and House 102–43).

48. *Votes on Proposed Amendments to the Texas Constitution 1875–May, 1993*, at 27, *reprinted*

*in* [4] 1993 Tex. Gen. Laws (amendment submitted May 1, 1993, defeated 755,417 to 1,293,224); *Edgewood IV*, 917 S.W.2d at 727.

49. Act of May 28, 1993, 73rd Leg., R.S., ch. 347, 1993 Tex. Gen. Laws 1479 [hereinafter Chapter 347]; *see Edgewood IV*, 917 S.W.2d at 727.

50. *Edgewood IV*, 917 S.W.2d at 727.

51. LBB PRIMER, *supra* note 13, at 2.

52. *Edgewood IV*, 917 S.W.2d at 727 (quoting former TEX. EDUC.CODE § 16.002(b), Chapter 347, *supra* note 49, at 1492, now TEX. EDUC. CODE § 42.002(b)(1)(A)); *see* LBB PRIMER, *supra* note 13, at 2.

53. Chapter 347, *supra* note 49, at 1498 (codifying former TEX. EDUC.CODE § 16.101).

54. TEX. EDUC.CODE § 42.101.

55. LBB PRIMER, *supra* note 13, at 14–16.

56. *Edgewood IV*, 917 S.W.2d at 727 (citing former TEX. EDUC.CODE § 16.254, Chapter 347, *supra* note 49, at 1509 1511); *see* LBB PRIMER, *supra* note 13, at 2.

crediting standards.[57] Tier 2 provides for partially state-supported local supplementation.[58] For each penny a district raises the tax rate above the minimum, the state guarantees a certain yield per weighted student—$20.55 in 1993,[59] and $27.14 today.[60] The tax rate for maintenance and operations continues to be capped at $1.50, subject to various adjustments and exceptions.[61] There is also some state funding for facilities, sometimes referred to as Tier 3 in the system.[62]

The major change that Senate Bill 7 made in the Foundation School Program was to equalize school districts' "wealth per student"—a district's taxable property value divided by the number of students in WADA.[63] A school district with wealth per student greater than a certain amount—$280,000 in 1993,[64] and $305,000 today[65]—must transfer the excess, or the tax revenue generated from it, either actually or effectively, so as to provide funding for school districts with less wealth.[66] The local tax revenue "recaptured" and redis-

tributed by this mechanism amounted to almost $1 billion in 2000.[67] This taxable wealth equalization scheme, dubbed by some "Robin Hood", eliminates the geographical disparities in available revenue among school districts that characterized the pre–1993 version of the Foundation School Program.

■ The public school finance system set up by Senate Bill 7 was challenged on numerous grounds, all of which we rejected in *Edgewood IV*. Two are important for purposes of the present case. We held that the unequalized funding available for local supplementation did not render the system constitutionally inefficient:

It is apparent from the Court's opinions that we have recognized that an efficient system does not require equality of access to revenue at all levels. Otherwise, unequalized local supplementation, which we expressly approved in *Edgewood II*, could never be justified. Article VII, section 1 of the Constitution and our previous *Edgewood* decisions

**57.** *See Edgewood IV*, 917 S.W.2d at 731 n. 10 ("Based on the evidence at trial, the district court found that meeting accreditation standards, which is the legislatively defined level of efficiency that achieves a general diffusion of knowledge, requires about $3,500 per weighted student.").

**58.** *See* LBB PRIMER, *supra* note 13, at 2.

**59.** *Edgewood IV*, 917 S.W.2d at 728 (citing former TEX. EDUC.CODE § 16.302, Chapter 347, *supra* note 49, at 1514).

**60.** TEX. EDUC.CODE § 42.302; *see* LBB PRIMER, *supra* note 13, at 16–17.

**61.** *Edgewood IV*, 917 S.W.2d at 728 (citing former TEX. EDUC.CODE § 16.303, Chapter 347, *supra* note 49, at 1514); TEX. EDUC.CODE §§ 42.303, 45.003(d).

**62.** *See* LBB PRIMER, *supra* note 13, at 2, 19–20.

**63.** *Edgewood IV*, 917 S.W.2d at 728 (citing former TEX. EDUC.CODE § 36.002, Chapter 347,

*supra* note 49, at 1480); Chapter 347, *supra* note 49, at 1479 (codifying former TEX. EDUC. CODE § 36.001); TEX. EDUC.CODE §§ 41.001–.002; LBB PRIMER, *supra* note 13, at 20–21.

**64.** *Edgewood IV*, 917 S.W.2d at 728 (citing former TEX. EDUC.CODE § 36.002, Chapter 347, *supra* note 49, at 1480).

**65.** TEX. EDUC.CODE § 41.002; LBB PRIMER, *supra* note 13, at 21.

**66.** *Edgewood IV*, 917 S.W.2d at 728 (citing former TEX. EDUC.CODE §§ 36.003–.004, Chapter 347, *supra* note 49, at 1480); TEX. EDUC. CODE §§ 41.003–.004 (requiring that a school district with excess wealth per student effectuate a reduction by one or more of the following: consolidation with another district, detachment of territory, purchase of average daily attendance credit, education of nonresident students, or tax base consolidation); LBB PRIMER, *supra* note 13, at 21.

**67.** LBB PRIMER, *supra* note 13, at 21.

mandate that efficiency be measured against both qualitative and financial standards.

The district court viewed efficiency as synonymous with equity, meaning that districts must have substantially equal revenue for substantially equal tax effort *at all levels of funding.* This interpretation ignores our holding in *Edgewood II* that unequalized local supplementation is not constitutionally prohibited. The effect of this "equity at all levels" theory of efficiency is to "level-down" the quality of our public school system, a consequence which is universally regarded as undesirable from an educational perspective. Under this theory, it would be constitutional for the Legislature to limit all districts to a funding level of $500 per student as long as there was equal access to this $500 per student, *even if* $3500 per student were required for a general diffusion of knowledge. Neither the Constitution nor our previous *Edgewood* decisions warrant such an interpretation.[68]

Constitutional efficiency under article VII, section 1 requires only that "districts must have substantially equal access to funding up to the legislatively defined level that achieves the constitutional mandate of a general diffusion of knowledge."[69] That legislatively defined level was an accredited education:

In Senate Bill 7, the Legislature equates the provision of a "general diffusion of knowledge" with the provision of an accredited education. The accountability regime set forth in [the statute], we conclude, meets the Legislature's

constitutional obligation to provide for a general diffusion of knowledge statewide.[70]

We cautioned, however, that the Constitution does not give the Legislature a completely free hand in determining what level of education will achieve the general diffusion of knowledge required by article VII, section 1:

As long as the Legislature establishes a suitable regime that provides for a general diffusion of knowledge, the Legislature may decide whether the regime should be administered by a state agency, by the districts themselves, or by any other means.

This is not to say that the Legislature may define what constitutes a general diffusion of knowledge so low as to avoid its obligation to make suitable provision imposed by article VII, section 1. While the Legislature certainly has broad discretion to make the myriad policy decisions concerning education, that discretion is not without bounds.[71]

The interrelated constitutional standards of efficiency and adequacy both limit legislative discretion:

As long as efficiency is maintained, it is not unconstitutional for districts to supplement their programs with local funds, *even if* such funds are unmatched by state dollars and *even if* such funds are not subject to statewide recapture. We caution, however, that the amount of "supplementation" in the system cannot become so great that it, in effect, destroys the efficiency of the entire system. The danger is that what the Legislature today considers to be

---

68. *Edgewood IV,* 917 S.W.2d at 729–730 (emphasis in original).

69. *Id.* at 730; *accord id.* at 731 ("The State's duty to provide districts with substantially equal access to revenue applies *only* to the

provision of funding necessary for a general diffusion of knowledge.").

70. *Id.* at 730.

71. *Id.* at 730 n. 8 (citation omitted).

"supplementation" may tomorrow become necessary to satisfy the constitutional mandate for a general diffusion of knowledge.[72]

"This is simply another way of saying that the State's provision for a general diffusion of knowledge must reflect changing times, needs, and public expectations."[73]

In *Edgewood IV*, we also held that Senate Bill 7 did not impose a state ad valorem tax in violation of article VIII, section 1–e of the Constitution simply because a number of school districts were already taxing at the maximum $1.50 rate. Some districts were taxing below the minimum $0.86 rate, and it appeared that for the most part "[p]roperty-poor and property-rich districts presently can attain the revenue necessary to provide suitably for a general diffusion of knowledge at tax rates of approximately $1.31 and $1.22, respectively."[74] We acknowledged, however, that over time more districts would be required to tax at the maximum $1.50 rate:

if the cost of providing for a general diffusion of knowledge continues to rise, as it surely will, the minimum rate at which a district must tax will also rise. Eventually, some districts may be forced to tax at the maximum allowable rate just to provide a general diffusion of

knowledge. If a cap on tax rates were to become in effect a floor as well as a ceiling, the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable because the districts would then have lost all meaningful discretion in setting the tax rate.[75]

Although we rejected all of the challenges to Senate Bill 7, we stressed that the system was "minimally acceptable only when viewed through the prism of history."[76] In other words, it was better than it had been. But we added: "Surely Texas can and must do better."[77] In every session since 1993, the Legislature has amended the Education Code,[78] but little change has been made in funding the maintenance and operation of public schools. As noted, the Tier 1 basic allotments, the Tier 2 guaranteed yields, and the equalization threshold have all been increased, thereby providing more state funds for public education, but the structure of the system remains essentially the same. Meanwhile, the level of state funding has continued to fall, reliance on local property taxes has increased,[79] and more school districts—now 39% with 32% of the State's 4.1 million students, according to petitioners' calculations from data fur-

72. *Id.* at 732 (emphasis in original).

73. *Id.* at 732 n. 14; *cf. Mumme v. Marrs* 120 Tex. 383, 40 S.W.2d 31, 36 (1931) ("The word 'suitable,' used in connection with the word 'provision' in this section of the Constitution, is an elastic term, depending upon the necessities of changing times or conditions, and clearly leaves to the Legislature the right to determine what is suitable, and its determination will not be reviewed by the courts if the act has a real relation to the subject and object of the Constitution." (citation omitted)).

74. *Edgewood IV,* 917 S.W.2d at 731 (footnote omitted).

75. *Id.* at 738.

76. *Id.* at 726.

77. *Id.*

78. *See* Act of May 27, 1995, 74th Leg., R.S., ch. 260, 1995 Tex. Gen. Laws 2207; Act of June 1, 1997, 75th Leg., R.S., ch. 1071, 1997 Tex. Gen. Laws 4087; Act of May 30, 1999, 76th Leg., R.S., ch. 396, 1999 Tex. Gen. Laws 2471; Act of May 28, 2001, 77th Leg., R.S., ch. 1187, 2001 Tex. Gen. Laws 2667.

79. Texas Legislative Budget Board, Financing Public Education in Texas Kindergarten Through Grade 12 Legislative Primer at 1 (3d ed.2001).

nished by the Texas Comptroller—have reached maximum tax rates.

Presciently, we observed in *Edgewood IV*: "Our judgment in this case should not be interpreted as a signal that the school finance crisis in Texas has ended."[80]

## II

In the case now before us, filed in April 2001, four school districts[81] assert that the public school finance system has come to involve a state ad valorem tax in violation of article VIII, section 1–e, just as we foresaw it might in *Edgewood IV*.[82] Specifically, after quoting our admonition from *Edgewood IV*, the plaintiffs alleged:

In the six years since the 1995 *Edgewood IV* decision, education costs have continued to rise. As predicted in *Edgewood IV*, school districts, such as the Plaintiffs, are required to tax at or near the maximum allowable $1.50 M & O [maintenance and operation] tax rate in order *to educate students in their districts*. Such school districts have lost all meaningful discretion in setting their M & O tax rate. Accordingly, as contemplated by the Supreme Court in *Edgewood IV*, the statutory cap on the M & O tax rate has become a statewide ad valorem tax in violation of the Texas Constitution. Without relief from the statutory cap on M & O tax rates, the Plaintiff school districts must continue to take such measures as cutting programs, eliminating teaching positions and/or increasing class size.

(Emphasis added.) Plaintiffs prayed for a judgment declaring the $1.50 statutory cap

to be a constitutionally prohibited state ad valorem tax.

The defendants[83] (collectively, "the State") answered with a plea to the jurisdiction, plea in abatement, and special exceptions, asserting that the action was not ripe and should be dismissed. Specifically, the State asserted:

- "the system would not result in a statewide ad valorem tax unless and until the 'cap on tax rates were to become in effect a floor as well as a ceiling' [quoting *Edgewood IV*, 917 S.W.2d at 738] *as to all districts*" (emphasis added), and plaintiffs do not and cannot allege that this is the situation;

- "Plaintiffs do not allege that the system requires them or any other district to tax at the rate of $1.50 *in order to provide a general diffusion of knowledge*" (emphasis in original) as they must to allege a constitutional violation, "but instead allege only that they must tax at (or near) $1.50 'in order to educate students in their districts'"; and

- because "each of the Plaintiff districts . . . has voluntarily elected to grant an optional twenty percent homestead exemption . . . they cannot plead or prove that the State system *forces* them to tax at $1.50 just to provide an accredited education."

The State's ripeness and pleading arguments were thus related: in the State's view, the claims the plaintiffs were required to plead in order to state the constitutional violation they asserted were not ripe.

In response, the plaintiffs argued that:

---

80. *Edgewood IV*, 917 S.W.2d at 725.

81. West Orange–Cove Consolidated I.S.D., Coppell I.S.D., La Porte I.S.D., and Port Neches–Groves I.S.D.

82. See *supra* note 75 and accompanying text.

83. Felipe Alanis, in his official capacity as the Commissioner of Education; Texas Education Agency; Carol Keeton Strayhorn, in her official capacity as Texas Comptroller of Public Accounts; and Texas State Board of Education.

- to show a state property tax they were required to prove only that *some,* not all, school districts were forced to tax at maximum rates;

- although the defendants contended that an accredited education could be provided for $4,179 per student, plaintiffs were entitled to explore the factual basis for that figure and to show that taxation at maximum rates was required to provide an accredited education; and

- homestead exemptions should not be taken into account in determining whether school districts were being forced to tax at maximum rates.

The plaintiffs contended that their pleadings were sufficient and stated claims that were ripe.

Two groups of school districts intervened. While they opposed the plaintiffs' claims, they alleged that the public school finance system remained flawed for other reasons. The six Edgewood intervenors [84] asserted:

> The Edgewood Intervenors are Defendant Intervenors to the extent that they agree that this case should be dismissed for lack of ripeness and, therefore, lack of subject matter jurisdiction. On the other hand, Edgewood Intervenors are Cross–Plaintiff Intervenors to the extent that they agree that the Texas School Finance System at $1.50 does not provide sufficient funding or equitable funding to guarantee a general diffusion of knowledge.

The thirty-four Alvarado intervenors [85] asserted: "In spite of the fact that progress is being made, Intervenors do not concede that the funding levels for Tier 2 districts set by the legislature achieves an adequate level of funding for public schools in Texas." They added that "the state is not contributing its fair share of monies needed to maintain an adequate school finance system." Regarding the plaintiffs' claims, they agreed with the defendants that they should be dismissed:

> Intervenors view Plaintiffs' case as a pure adequacy claim. As stated above, the $1.50 tax rate cap never becomes a factor unless total revenues available to school districts are inadequate to provide for a general diffusion of knowledge. Intervenors believe that the maintenance of an equitable system is the best way to insure adequacy.

The Alvarado intervenors specially excepted to the plaintiffs' pleading for alleging only that they were required to tax at maximum rates "to educate their students" rather than "to provide the constitutionally-required general diffusion of knowledge to their students." The plaintiffs responded:

> This special exception mischaracterizes Plaintiffs' pleading and constitutes unnecessary hairsplitting over semantics. [Plaintiffs quoted from *Edgewood IV* and] then made clear that their cause of action was based on the [quoted] language, and that they are required to tax "at or near the $1.50 M & O tax rate in order to educate students in their dis-

**84.** Edgewood I.S.D., Ysleta I.S.D., Laredo I.S.D., San Elizario I.S.D., Soccorro I.S.D., and South San Antonio I.S.D.

**85.** Alvarado I.S.D., Anthony I.S.D., Aubrey I.S.D., Bangs I.S.D., Bells I.S.D., Community I.S.D., Cooper I.S.D., Covington I.S.D., Detroit I.S.D., Early I.S.D., Fannindel I.S.D., Hutto I.S.D., Karnes City I.S.D., Kaufman I.S.D., Kirbyville I.S.D., Krum I.S.D., La Joya I.S.D., Mercedes I.S.D., Meridian I.S.D., New Boston I.S.D., Nocona I.S.D., Olfen I.S.D., Orange Grove I.S.D., Poteet I.S.D., Robinson I.S.D., Rosebud–Lott I.S.D., Rusk I.S.D., Southside I.S.D., Tornillo I.S.D., Trenton I.S.D., Tulia I.S.D., Uvalde I.S.D., Venus I.S.D., and Weaterford I.S.D.

tricts", i.e., to provide a general diffusion of knowledge. Because the "floor" described by the Court [in *Edgewood IV*] is linked to the "general diffusion of knowledge" standard, Plaintiffs were implicitly (if not explicitly) alleging that they had to tax at or near $1.50 just to provide their students with a general diffusion of knowledge.

Ten weeks after the case was filed, the trial court conducted a hearing on the dilatory pleas and the special exceptions. The defendants argued, and the trial court agreed, that this Court's admonition in *Edgewood IV* that the finance system could result in a state property tax was dicta.[86] The plaintiffs argued, however, that this Court had described circumstances that could violate the constitutional prohibition of a state ad valorem tax, and that they were entitled to prove that those circumstances had come into existence. Regarding the plaintiffs' pleadings, the following colloquy occurred:

> THE COURT: Well, let me ask counsel for the plaintiffs: are you ... pleading that ... you can't provide an accredited system on $1.50 or are you pleading that the accredited system isn't *good enough* to provide a general diffusion of knowledge and you can't provide a general diffusion of knowledge on $1.50?

> COUNSEL: All of the above. All the above.... And again, we're involved in notice pleading. We pled it. It's pretty clear what we're driving at. We're driving at page 738 of the *Edgewood [IV]* majority opinion.

The trial court did not hear evidence but did take judicial notice of state appropriations and school district tax levies.

Less than a month later, the trial court issued an order dismissing the case. The court explained in the order:

> Whether the Legislature has imposed a *state* ad valorem tax is decided by reference to how the public school finance system works throughout the state, not by reference to how the system works in any one district. Moreover, to look at the question district by district would mean that the tax could be constitutional in one district and unconstitutional in another. Thus, the court must assess the system as a whole.

\* \* \*

Remember that the constitutional question is not how many districts *are* at the cap, but how many districts *must be* at the cap to provide an accredited education. The court today is merely holding that a plaintiff must be able to plead that some significant number of districts *are* at the cap to go forward with a claim that too many districts *must be* at the cap. Naturally, the court has assumed on special exceptions that if a district is at the cap, the district must be at the cap. This pleading assumption builds in a significant margin of error in favor of the plaintiff districts.

The margin of error is in favor of the plaintiff districts because, on the merits, the plaintiffs must show that the highly-acclaimed school districts taxing at $1.50 would plummet to academically-unacceptable school districts at $1.49.

---

**86.** The trial court stated in its order: "The changed-circumstances warning in *Edgewood IV* appears to be obiter dictum. Should the Supreme Court consider the present case, this court respectfully urges a reconsideration of this dictum. For the reasons cited, the court has concerns about the historical and analytical foundations of this dictum. Of course, dictum or not, the court today has faithfully followed the teachings of the Supreme Court, heeded the changed-circumstances warning, and applied the meaningful-discretion test."

* * *

Though *Edgewood IV* provides limited guidance on how many districts must have to tax at the cap to be constitutionally significant, or, in other words, for the court to conclude that the districts have lost "meaningful discretion" in levying the ad valorem tax, based upon what the Supreme Court does teach, this court holds that for the approved tax to become a prohibited *state* ad valorem tax, some significant number of districts across the state must have to tax at the $1.50 cap in order to provide an accredited education. For the legislative design to be an unconstitutional *state* ad valorem tax, the design must require a significant number of districts to tax at the cap, something approaching or exceeding half the districts.

Thus, a single number decides the case on special exceptions—the percentage of districts that are at the cap of $1.50. The plaintiffs do not and cannot state a claim upon which relief can be granted because a constitutionally insignificant number of districts are at the cap of $1.50. Only 19% of the school districts even tax at the cap of $1.50, which means that 81% do not. Indeed, two of the plaintiff districts do not tax at the $1.50 rate. Moreover, many districts, including all four plaintiffs, have granted local-option tax exemptions. Only 12% of the school districts tax at the cap of $1.50 without a local-option exemption, which means that 88% do not.

Of course, the decision to grant a local-option exemption in and of itself is the exercise of meaningful local discretion. By granting a local-option exemp-

tion, for whatever worthy reason, a school district takes a great amount of taxable wealth out of the system.... The court is not implying that these exemptions are not appropriate; the court is merely saying that they have the same effect as substantially lowering the tax rate. As long as a district has an exemption, therefore, it is not at the tax cap.

The court dismissed with prejudice the plaintiffs' allegation of an existing violation of article VIII, section 1–e, and dismissed without prejudice the plaintiffs' allegation that a violation was imminent.

The court of appeals affirmed,[87] but not for the reasons given by the trial court. Although the court of appeals considered the pleading and ripeness issues separately, it recognized that the parties' arguments on both issues are related. In the court of appeals' view, the number of school districts taxing at maximum rates was irrelevant. "Whether the effect of the tax is experienced '*statewide*' or by a majority of districts in the state does not determine whether a tax is a state tax."[88] Rather, the court said, "the controlling factor in reviewing a challenge to an alleged ad valorem tax is the State's involvement in the levy."[89] "Seen in this light," the court said, "the positions taken by the district court ... and by the parties in their briefs, are based on a misunderstanding of the determinative factors of a state ad valorem tax."[90]

Regarding the plaintiffs' pleadings, the court explained:

In determining the State's control over the maintenance and operations property tax, the relevant inquiry is the relationship between the tax and the

---

**87.** 78 S.W.3d 529 (Tex.App.-Austin 2002).

**88.** *Id.* at 542 (emphasis in original).

**89.** *Id.*

**90.** *Id.*

districts' obligations to provide an accredited education. As the court found in *Edgewood IV*, the system may encourage districts to tax at or near the maximum rate. Whether it does so is irrelevant for purposes of determining whether the system imposes a state tax. But if the districts' abilities to fulfill a state mandate, here the obligation to provide the minimum accredited education, forced the districts to tax at the maximum rate, the system might approach an unacceptable level of state control over the levy. Therefore, the allegation that a district is forced to tax at the highest allowable rate to provide the bare, accredited education is a necessary element of a cause of action brought by a district challenging the cap.[91]

The court concluded that the plaintiffs had failed to make this allegation:

West Orange–Cove instead pleaded that it was forced to tax at or near $1.50 to "educate its students." The enriched education that West Orange–Cove locally desires to provide its students is not the measure for determining if the State is imposing an educational mandate that requires the local district to levy a state-imposed rate of tax. West Orange–Cove's pleadings simply fail to state a viable cause of action.[92]

Because the plaintiffs'

allegation does not refer to the districts' state-imposed obligation to provide an accredited education ..., the districts' pleadings fail to state a challenge to the tax as a *state* tax. Accordingly, we hold that the trial court properly dismissed the claim for failure to state a cause of action.[93]

The court also held that the plaintiffs' claim that taxation at maximum rates was necessary to achieve the constitutional standard of "a general diffusion of knowledge" was nonjusticiable:

As the record makes clear, West Orange–Cove wants to use this opportunity, framed as a tax challenge, to engage the judiciary in a debate over policy choices that are within the province of the legislative branch. Both the Legislature and the supreme court have equated the term "general diffusion of knowledge" with accreditation standards. The court, in addition, has insisted that the judiciary has a limited role in the area of educational policy and should defer to the Legislature on matters involving educational standards and funding ... [citing *Edgewood IV*, 917 S.W.2d at 726]. West Orange–Cove's claim would involve the courts in deciding what is meant by the term "general diffusion of knowledge" without reference to the accreditation standards set by the Legislature. That body, however, has conclusively equated the two concepts, thereby foreclosing the judicial inquiry West Orange–Cove seeks to pursue. Moreover, as the supreme court has recognized, the meaning of a "general diffusion of knowledge" and the development of appropriate accreditation standards are policy choices best suited to the legislature. *Id.*[94]

Summarizing its holdings, the court of appeals stated:

The instant case is not unripe because fewer than half of all school districts are taxing at the maximum rate; rather, the claim is unripe because the appellants have failed to demonstrate that they are

---

**91.** *Id.* at 539.

**92.** *Id.*

**93.** *Id.* at 540 (emphasis in original).

**94.** *Id.*

forced to set their rates of tax at the maximum allowable rate just to provide an accredited education. That is, the districts have not pleaded that they have lost all meaningful discretion in setting the rate of tax as it pertains to their ability to meet a state-imposed obligation, which is the only relevant concern in this lawsuit.[95]

We granted the plaintiffs' petition for review and expedited oral argument.[96]

## III

We consider first what the plaintiffs must allege to state a violation of article VIII, section 1-e, and then whether the plaintiffs can and do make that allegation.

## A

■ We adhere to the rule stated in *Edgewood III* that "[a]n ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion."[97] The determining factor is the extent of the State's control over the taxation process.

■ The State argues that local school district property taxes cannot be a state tax unless *every* district is forced to tax at a specific rate, here, the maximum $1.50 rate for maintenance and operation (subject to adjustments). The trial court rejected this argument but held that there can be no state tax unless *most* districts are forced to tax at maximum rates. Both positions presuppose that the issue is the extent of the tax and that the determination must be made from the perspective of the system as a whole rather than with respect to each district. As the trial court stated: "Whether the Legislature has imposed a *state* ad valorem tax is decided by reference to how the public school finance system works throughout the state, not by reference to how the system works in any one district." This premise has no support in the constitutional text or the rule we have stated for applying it. The Constitution prohibits "State ad valorem taxes ... upon *any* property within this State" (emphasis added) and is not limited to *statewide* ad valorem taxes. The provision expressly contemplates that a state ad valorem tax could be levied on only *some* property. The prohibition does not permit the State to set rates for hospital districts, or junior college districts, or mosquito control districts, or fire prevention districts, or noxious weed control districts—to name but a few of the many taxing authorities[98] —just because such districts are confined to a few areas of the State, nor does the Constitution permit the State to control the tax rate for even one such district. Were it otherwise, then as we observed in *Edgewood III*:

> The State could create County Highway Districts, or County Prison Districts, or all-purpose County Funding Districts to levy taxes at set rates for prescribed purposes, and by such means accomplish what it could not do itself.[99]

The concern is not the pervasiveness of the tax but the State's control of it. A state ad valorem tax is just that—one imposed by the State, whether it acts directly or through control of another entity, and whether the tax falls on the entire population or only a few.

95. *Id.* at 542.

96. 46 Tex. Sup.Ct. J. 426, 428 (Feb. 13, 2003).

97. *Edgewood III*, 826 S.W.2d at 502.

98. *See* Tex. Tax Code § 1.04(12).

99. *Edgewood III*, 826 S.W.2d at 501.

■■■ Thus, a single district states a claim under article VIII, section 1–e if it alleges that it is constrained by the State to tax at a particular rate. How a constitutional violation in one or a few school districts would impact the public school finance system as a whole is not before us.

**B**

The State argues that for four reasons the plaintiffs cannot allege that they are forced to tax at maximum rates. To sustain the dismissal of the plaintiffs' case on the pleadings, however, the State must establish the plaintiffs' inability to plead a constitutional violation as a matter of law.[100] We examine each of the State's reasons in turn.

**1**

The State asserts that it exerts no control over taxation by local school districts and that the districts are free to tax at any levels they choose up to the maximum. The State's argument runs as follows. The duty to provide an adequate public education belongs to the Legislature, not local school districts. School districts are "forced" to do nothing; they *choose* to tax and educate at desired levels. While the State may encourage certain choices, it does not compel them.

■■■ This argument, in essence, is that nothing short of virtually absolute state control of ad valorem taxation violates article VIII, section 1–e. We plainly rejected the argument in *Edgewood III:*

How far the State can go toward encouraging a local taxing authority to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities. If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e. It is difficult, perhaps impossible, to define for every conceivable hypothetical precisely where along this continuum such taxes become state taxes.[101]

Certainly, the State does not now control taxation by school districts to the same extent it controlled taxation by the CEDs. But as we have said, the constitutional prohibition is violated whenever state control denies a taxing authority "meaningful discretion".[102]

■■■ The Legislature has deprived school districts of any meaningful discretion to provide an inadequate education, as indeed it is constitutionally bound to do. The Legislature's duty under article VII, section 1 is to make suitable provision for a general diffusion of knowledge through free public schools. "As long as the Legislature establishes a suitable regime that provides for a general diffusion of knowledge, the Legislature may decide whether the regime should be administered by a state agency, by the districts

---

**100.** *See Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998).

**101.** *Edgewood III,* 826 S.W.2d at 502–503.

**102.** *Id.* at 502.

themselves, or by any other means." [103] "Certainly, if the Legislature substantially defaulted on its responsibility such that Texas school children were denied access to that education needed to participate fully in the social, economic, and educational opportunities available in Texas, the 'suitable provision' clause [of article VII, section 1] would be violated." [104] "In *Edgewood I,* we reaffirmed that the requirement of suitability is a judicially-enforceable mandate...." [105] A public school system dependent on local districts free to choose not to provide an adequate education would in no way be suitable. In fact, the Legislature has acted to ensure that that is *not* the system. Chapter 39 of the Education Code, entitled "Public School System Accountability", sets school accreditation standards,[106] rewards achievement of these standards,[107] and imposes sanctions for non-compliance ranging from admonitions to closure of the district.[108] These provisions are legislated requirements that school districts provide an adequate education, and they leave no meaningful discretion for districts to do otherwise.

We also rejected the position for which the State now argues in *Edgewood IV,* expressly recognizing that school districts could indeed be "forced"—our word—by increasing costs "to tax at the maximum

allowable rate just to provide a general diffusion of knowledge." [109] The "ceiling", we said, could become a "floor" as well, in which event "the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable because the districts would then have lost all meaningful discretion in setting the tax rate." [110] The State successfully argued to the trial court that these statements were dicta,[111] but they were an important part of our rationale.[112] We held in *Edgewood IV* that local ad valorem taxes were not state ad valorem taxes because of then-existing circumstances that allowed school districts meaningful discretion in setting tax rates, and we expressly acknowledged that those circumstances could, and probably would, change. That distinction defined the reach of the Court's decision in the case. Had we thought that local school district property taxes could never violate article VIII, section 1-e, our decision would certainly have been far easier.

■ We remain of the view that school districts can be forced by the current system to tax at maximum rates. An allegation that this has occurred states a claim under article VIII, section 1-e.

### 2

Alternatively, the State argues that its only requirement of school districts is that

103. *Edgewood IV,* 917 S.W.2d at 730 n. 8.

104. *Id.* at 736.

105. *Id.* at 735.

106. TEX. EDUC.CODE § 39.072.

107. *Id.* §§ 39.091–.112.

108. *Id.* § 39.131; *see Edgewood IV,* 917 S.W.2d at 729 ("Districts that chronically fail to maintain accreditation standards are subject to penalties, including dissolution of the offending school district and its annexation to another district.").

109. *Edgewood IV,* 917 S.W.2d at 738.

110. *Id.*

111. See note 86 *supra.*

112. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (" 'Although technically dicta, ... an important part of the Court's rationale for the result it reache[s] ... is entitled to greater weight ....' " (quoting *Sheet Metal Workers v. Equal Employment Opportunity Comm'n,* 478 U.S. 421, 490, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (O'Connor, J., concurring))).

they provide an accredited education as defined by the Legislature, and that the plaintiffs cannot allege in good faith that any district is forced to tax at the maximum rate just to meet this requirement. On the contrary, the State says, school districts taxing at maximum rates do so to provide enhanced educational opportunities and not merely to maintain accreditation. The court of appeals appears to have agreed with this argument.

 Again, the State's argument suffers a flawed premise. Accreditation standards are not the only requirements the State imposes on school districts. As we have just explained, because the State has chosen to rely heavily on school districts to discharge its duty to provide a constitutionally adequate education—that is, "[a] general diffusion of knowledge · . . . essential to the preservation of the liberties and rights of the people" [113]—the State must require that school districts achieve this goal; otherwise, the public school system is not suitable for its purpose. Consistent with its constitutional duty, the Legislature has stated:

> The mission of the public education system of this state is to ensure that all Texas children have access to a quality education that enables them to achieve their potential and fully participate now and in the future in the social, economic, and educational opportunities of our state and nation. That mission is

grounded on the conviction that a general diffusion of knowledge is essential for the welfare of this state and for the preservation of the liberties and rights of citizens.[114]

We acknowledged in *Edgewood IV* that the Legislature in 1993 equated an accredited education with a general diffusion of knowledge and discharged its duty to provide for the latter by demanding accountability of school districts.[115] But we also insisted that the "State's provision for a general diffusion of knowledge must reflect changing times, needs, and public expectations",[116] and that the Legislature is not the sole arbiter of the constitutional standard.[117] The public school system the Legislature has established requires that school districts provide both an accredited education and a general diffusion of knowledge. It may well be that the requirements are identical; indeed, as in *Edgewood IV*, we presume they are, giving deference to the Legislature's choices. But it is possible for them not to be—an accredited education may provide more than a general diffusion of knowledge, or vice versa—and because both are binding, a district may allege that taxation at a maximum rate in order to satisfy either is a state ad valorem tax.

 The court of appeals concluded that to "involve the courts in deciding what is meant by the term 'general diffusion of knowledge' without reference to the accreditation standards set by the Legisla-

---

113. Tex. Const. art. VII, § 1.

114. Tex. Educ. Code § 4.001(a).

115. *Edgewood IV*, 917 S.W.2d at 730 ("In Senate Bill 7, the Legislature equates the provision of a 'general diffusion of knowledge' with the provision of an accredited education. The accountability regime set forth in Chapter 35, we conclude, meets the Legislature's constitutional obligation to provide for a general diffusion of knowledge statewide.").

116. *Id.* at 732 n. 14.

117. *Id.* at 730 n. 8 ("This is not to say that the Legislature may define what constitutes a general diffusion of knowledge so low as to avoid its obligation to make suitable provision imposed by article VII, section 1. While the Legislature certainly has broad discretion to make the myriad policy decisions concerning education, that discretion is not without bounds.").

ture" would "engage the judiciary in a debate over policy choices that are within the province of the legislative branch." [118] We agree, as we have already explained, that it is outside the scope of judicial authority to review the Legislature's policy choices in determining what constitutes an adequate education, and we emphasize that the courts cannot undertake to review those choices one by one or attempt to define in detail an adequate education. But once policy choices have been made by the Legislature, it is the judiciary's responsibility in a proper case to determine whether those choices as a whole meet the standard set by the people in article VII, section 1.

Even if the plaintiffs' claims were limited to taxing to provide an accredited education, there is no factual record for determining what the cost of an accredited education is. The plaintiffs urged in the trial court that they were entitled to discover the State's evaluation of that cost and to present evidence that the true cost is greater. For the trial court, this factual dispute was irrelevant, given its view that the plaintiffs could not allege a constitutional violation because they could not allege that half or close to half of all school districts were taxing at maximum rates. But since we have concluded, as the court of appeals did, that the number of districts taxing at maximum rates is not determinative of the plaintiffs' claims, the subsisting dispute over the cost of an accredited education precludes dismissal of the case on the pleadings.

Thus, to obtain dismissal of the plaintiffs' claims on the merits based solely on the pleadings, the State must establish as a matter of law that the plaintiff school districts are not forced to tax at maximum

rates either to meet accreditation standards or to provide a general diffusion of knowledge. The State has done neither.

### 3

■ The Legislature has granted a partial homestead exemption from school district taxation,[119] which a district may increase up to a certain amount at its option,[120] as many districts do. The State argues that no school district that has opted for an increased homestead exemption can allege that it is forced to tax at maximum rates because it has meaningful discretion to deny the increased exemption and tax at a lower rate. The trial court agreed with this argument, and the court of appeals did not address it.

We reiterate that to obtain dismissal of the plaintiffs' action based solely on the pleadings, the State must establish that the mere existence of local-option exemptions precludes as a matter of law the allegation that school districts are forced to tax at maximum rates. The State has not met this burden. For one thing, the plaintiffs may be able to show that even without granting additional homestead exemptions, they could not provide an accredited education or a general diffusion of knowledge. For another thing, while school districts obviously have discretion whether to increase homestead exemptions, it is far from obvious that their discretion is meaningful. By authorizing local-option homestead exemptions, knowing that some constituencies will insist on them, the Legislature may actually have increased the pressure on school districts to tax at maximum rates. In any event, the plaintiffs are entitled to attempt to

---

118. 78 S.W.3d 529, 540 (Tex.App.-Austin 2002).

119. Tex. Tax Code § 11.13(b)-(c).

120. *Id.* § 11.13(d)-(f), (n).

show that homestead exemptions do not afford them meaningful discretion.

### 4

■ Finally, the State argues that the plaintiffs cannot allege a violation of article VIII, section 1–e unless they tax at the applicable absolute maximum rate, not merely near that rate, as apparently only two of the four plaintiffs do. This is simply not the case. The constitutional issue remains the extent of the State's control. It may be that a school district taxing at $1.47 instead of $1.50 has exercised meaningfully discretion, but that is not necessarily the case. A district taxing a few cents below the maximum rate that can no longer provide an accredited education or a general diffusion of knowledge even by raising the rate to the maximum need not do so just to prove the point.

### C

■ The last matter is whether the plaintiffs *did* plead what they must to allege a violation of article VIII, section 1–e. The plaintiffs alleged that they were required to tax at maximum rates "to educate their students". In response to special exceptions, the plaintiffs stated that their allegation was tantamount to pleading that taxing at maximum rates was necessary to provide for a general diffusion of knowledge. When asked by the trial court whether the plaintiffs were pleading that they could not provide an accredited education or a general diffusion of knowledge at maximum rates, counsel responded, "All of the above." The plaintiffs repeatedly stated that they were pleading that the situation we foresaw in

*Edgewood IV* would violate article VIII, section 1–e had in fact occurred. No reasonable argument can be made that the plaintiffs' pleadings did not put the State on notice of their claims. Of course, on special exceptions the trial court has discretion to further clarify the issues to be litigated by requiring the plaintiffs to allege specifically, for example, whether they are taxing at maximum rates to provide an accredited education, or to provide for a general diffusion of knowledge, or both, and whether the costs are different.

### III

We add a few words in response to the dissent.

■ First: The dissent would hold that plaintiffs lack standing to sue. While "standing, as a component of subject matter jurisdiction, cannot be waived" [121] and may thus be raised at any time, the fact that the State has not challenged the plaintiffs' standing to sue, nor was the standing of any school district challenged in *Edgewood I, Edgewood II, Edgewood III,* or *Edgewood IV,* is some indication of the weakness of the dissent's argument. In *Nootsie, Ltd. v. Williamson County Appraisal District,* we held that a county appraisal district had standing to seek a declaratory judgment that the Legislature had unconstitutionally defined open-space land for tax purposes to include ecological laboratories.[122] We see no difference in the standing of an appraisal district to assert its claims in *Nootsie* and the standing of the school districts here. The dissent argues that *Nootsie* is at odds with federal standing jurisprudence, but even if it were—something we need not decide

---

121. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445–446 (Tex.1993).

122. 925 S.W.2d 659, 661–662 (Tex.1996) (citing *Robbins v. Limestone County,* 114 Tex.

345, 268 S.W. 915, 917 (1925) (holding that county and road districts can sue the state highway commission on the ground of the invalidity of statutes)).

here—the dissent does not explain why any difference between Texas law and federal law is reason enough for us not to follow our own recent precedent. The dissent also argues that because the plaintiff school districts do not have and do not claim to have a constitutional right to meaningful discretion, they have no standing to seek a determination that taxation at maximum rates is a constitutionally prohibited state ad valorem tax. Again conceding the premise solely for argument purposes, we fail to see how the declaration the school districts request in this case is any different from the one the appraisal district requested in *Nootsie*. As we explained in *Nootsie*, the argument that

> the district has no inherent vested rights protected by the Constitutions of Texas and the United States ... misses the mark because the district does not contend that the statute violates constitutional rights belonging to the district. Instead, the district asserts an interest because it is charged with implementing a statute that it believes violates the Texas Constitution. This interest provides the district with a sufficient stake in this controversy ... that the declaration sought will resolve.[123]

Finally, the dissent argues that *Nootsie* can be distinguished because there the appraisal district represented aligned interests while here the plaintiff school districts represent disparate and conflicting interests. We do not understand this distinction. *Nootsie* allowed an appraisal district to challenge the constitutionality of a tax exemption that at least one of its taxpayers, Nootsie, Ltd., claimed and others may have opposed. We fail to see how the interests of the taxpayers and citizens in the appraisal district in *Nootsie* were any

less at odds than the interests of the taxpayers and citizens in the plaintiff school districts are here. For the same reasons we explained in *Nootsie*, we hold that the plaintiff school districts in this case have standing to assert their claims.

Second: Contrary to the dissent's assertion, we do not hold that school districts have a constitutional duty to provide for a general diffusion of knowledge. The districts' obligation is imposed by the Legislature, not the Constitution, as the passage of our opinion to which the dissent refers expressly states—"*[t]he public school system the Legislature has established* requires that school districts provide both an accredited education and a general diffusion of knowledge" (emphasis added)—and we repeat elsewhere and now again here. The Legislature has expressly defined the mission of the public school system, including school districts, to accomplish a general diffusion of knowledge.[124] As we have explained, the Legislature has chosen to make suitable provision for a general diffusion of knowledge by using school districts, and therefore the State cannot be heard to argue that school districts are free to choose not to achieve that goal. If they were, the Legislature's use of districts to discharge its constitutional duty would not be suitable, since the Legislature would have employed a means that need not achieve its end.

Third: The dissent would hold, contrary to *Edgewood III* and *Edgewood IV*, that a state ad valorem tax is a tax used for a state purpose rather than a tax levied by the State. We find nothing in the text or history of article VIII, section 1–e to require that a state tax be determined by its purpose rather than by the extent of state control over its employ-

---

123. *Id.* at 662 (citations omitted).

124. Tex. Educ.Code § 4.001(a).

ment. Nor are we clear how such a purpose-oriented standard would operate. In the dissent's view, any effort to equalize tax revenues among school districts for public education violates article VIII, section 1–e because education is a state purpose. This directly contradicts the Court's holdings in *Edgewood III* and *Edgewood IV*. We do not agree with the dissent that the importance of *stare decisis* can be minimized in this area. For fourteen years the Legislature has worked to bring the public school finance system into conformity with constitutional requirements as declared by this Court. To announce now that we have simply changed our minds on matters that have been crucial to the development of the public education system would not only threaten havoc to the system, but would, far more importantly, undermine the rule of law to which the Court is firmly pledged.

Fourth: The dissent argues that this Court's construction of article VII, section 1 since *Edgewood I* and perhaps dating back to *Mumme v. Marrs*[125] necessarily draws the judiciary into making detailed policy decisions about the elements of an adequate education. We reiterate that the Constitution requires, not that courts make such policy decisions, but that they determine, in a proper case, whether the Legislature on the whole has discharged its constitutional duty.

* * * * * *

For these reasons, we conclude that the lower courts erred in dismissing the plaintiffs' action on the pleadings. The judgment of the court of appeals is reversed

and the case is remanded to the trial court for further proceedings consistent with this opinion.

Justice ENOCH filed a concurring opinion.

Justice SMITH filed a dissenting opinion.

Justice ENOCH filed a concurring opinion.

In 1995, I wrote that Senate Bill 7[1] was, in my opinion, unconstitutional.[2] That is still my opinion. But that question was decided to the contrary by the Court then, and the question before us is only what must a school district plead to demonstrate a claim that Senate Bill 7 operates unconstitutionally now. On this narrow question, I generally agree with the Court's opinion and with its judgment. Therefore I concur.

I write separately to note that I too make a distinction between "accreditation" and "general diffusion of knowledge." But I disagree with the Court's conclusion that whether a violation under Texas Constitution article VIII, section 1–e[3] has occurred can be demonstrated simply by alleging that the school district must tax at the rate set by the State to provide for a general diffusion of knowledge rather than accreditation.

For a prohibited state property tax to exist, the Legislature must both dictate the tax to be collected and dictate what is

125. 120 Tex. 383, 40 S.W.2d 31, 36 (1931) ("The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen.").

1. Act of May 28, 1993, 73rd Leg., R.S., ch. 347, 1993 Tex. Gen. Laws 1479.

2. *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex.1995) [*Edgewood IV*] (Enoch, J., concurring in part and dissenting in part).

3. Tex. Const. art. VIII, § 1–e.

to be done with the tax.[4] Under the Texas Constitution, it is the Legislature that must provide for the general diffusion of knowledge, not the school districts.[5] The Court slides over this distinction by asserting, generally, that the Legislature has chosen to satisfy its obligation to provide for the general diffusion of knowledge through school districts, and thus, this equates to ordering the school districts to provide for the general diffusion of knowledge.[6] I am not persuaded. The Legislature, through the Texas Education Code, requires only that school districts provide an accredited education.[7]

On the narrow question before us, I agree with the Court that the school districts should be afforded the opportunity to plead that they must tax at the tax rate set by the State to provide an accredited education. But I do not agree that the school districts can assert the need to provide for a general diffusion of knowledge and implicate an impermissible state ad valorem property tax.

That said, I join the Court's judgment to remand this case to the trial court for further proceedings.

Justice SMITH, dissenting.

In the 1989–1990 school year, during which this Court issued its landmark *Edgewood I* decision, funding for primary and secondary education in Texas totaled $15.3 billion. TEX. EDUC. AGENCY, SNAPSHOT 1990: 1989–90 SCHOOL DISTRICT PROFILES, at 19 (1991). Since that decision, the funding disparity among school districts has decreased significantly, and student test scores and other indicia of educational quality have increased statewide. However, like all government services, education

costs money. By the 2000–2001 school year, total funding for primary and secondary education had risen to $35.4 billion. TEX. EDUC. AGENCY, SNAPSHOT 2001: 2000–01 SCHOOL DISTRICT PROFILES, at 28 (2002). Another truism regarding government services is that taxpayers supply virtually all of the money required to deliver those services.

Article VIII, section 1-e of the Texas Constitution prohibits a state property tax. In this case, four school districts, nominally representing the taxpayers of their respective districts, assert that the state's public school finance system violates article VIII, section 1-e. However, the purpose of the litigation is not to vindicate taxpayers' rights. Rather, the acknowledged purpose is to bring several billion dollars of additional "resources" (a/k/a tax revenue) into the school finance system.

In resolving this case, the Court makes several fundamental errors. However, because this appeal is being determined on an expedited basis, I am able to fully address only three of those errors.

First, the Court decides a case over which it lacks subject matter jurisdiction. Taxpayers can bring their own lawsuit if it is in their best interests. Therefore, the plaintiff school districts should be denied standing to sue.

Second, brushing aside the rulings of the district court and the court of appeals, and ignoring its own relevant precedent and persuasive precedent of other state supreme courts, the Court holds that school districts have a legal obligation to comply with the general diffusion of knowledge standard contained in article VII, section 1

---

4. *See Edgewood IV,* 917 S.W.2d at 737 (quoting *Edgewood III,* 826 S.W.2d at 502).

5. *See* TEX. CONST. art. VII, § 1.

6. 107 S.W.3d 584.

7. *See* TEX. EDUC.CODE §§ 39.071–.076.

of the Texas Constitution. The holding transforms this putative taxpayer suit brought under article VIII, section 1–e into an article VII, section 1 "adequacy" challenge. Nobody, including the taxpayers of the plaintiff school districts, should be fooled by this constitutional sleight of hand.

Finally, the Court reaffirms its narrow construction of article VIII, section 1–e, and in substance validates once again the much maligned "Robin Hood" component of the state's public school finance system. The Court's stated defense of adherence to the "rule of law" will ring hollow to those Texans saddled with paying excessive property taxes that are both inequitable and unconstitutional.

In my view, the Court's resolution of this case is unfair to Texas taxpayers and represents a setback for Texas constitutional jurisprudence. Accordingly, I respectfully dissent.

# I

## Standing

The plaintiffs, four independent school districts, are political subdivisions of the State. They have sued the State contending generally that the public school finance system violates article VIII, section 1–e of the Texas Constitution. Specifically, the school districts assert that they have lost all "meaningful discretion" in setting their maintenance and operations tax rate and therefore "the statutory cap on the M & O tax rate has become a statewide ad valorem tax." The only judicial relief sought by the plaintiffs is a declaration that the "statutory cap on M & O tax rates constitutes an unconstitutional statewide ad valorem tax."

## A

In *Texas Association of Business v. Air Control Board,* 852 S.W.2d 440 (Tex.1993), this Court stated:

Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdiction is never presumed and cannot be waived.

. . . .

... Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

. . . .

... We therefore hold that standing, as a component of subject matter jurisdiction, cannot be waived in this or any other case and may be raised for the first time on appeal by the parties or by the court.

*Id.* at 443–46.

The standing test used by the federal courts requires "the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citations and quotations omitted). The standing test used by Texas courts requires that "(a) there shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Bd. of Water Eng'rs*

*v. City of San Antonio*, 155 Tex. 111, 283 S.W.2d 722, 724 (1955). The federal and Texas standing tests are both based in large part on the constitutional separation of powers doctrine. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 444 (citing *Valley Forge Christian College* in support of the following statement: "One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine.").

Although the federal and Texas standing tests are phrased in somewhat different terms, their substance is substantially similar.[1] For example, in both federal and Texas courts, a political subdivision lacks standing to pursue a claim that the state has violated its constitutional rights. *See, e.g., Coleman v. Miller*, 307 U.S. 433, 441, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."); *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex.1966) (holding that political subdivisions "do not acquire vested rights against the State").

However, there are some differences between federal and Texas standing requirements. For example, in *Nootsie, Ltd. v. Williamson County Appraisal District*, 925 S.W.2d 659 (Tex.1996), the Court stated:

> Nootsie argues that as a political subdivision of the State, the district has no inherent vested rights protected by the Constitutions of Texas and the United States. This argument misses the mark because the district does not contend

that the statute violates constitutional rights belonging to the district. Instead, the district asserts an interest because it is charged with implementing a statute that it believes violates the Texas Constitution. This interest provides the district with a sufficient stake in this controversy to assure the presence of an actual controversy that the declaration sought will resolve.

*Id.* at 662 (citations omitted). The specific standing rule set forth in *Nootsie* differs from the federal rule regarding such third-party standing. *See Smith v. Indiana*, 191 U.S. 138, 148–49, 24 S.Ct. 51, 48 L.Ed. 125 (1903) (county auditor "charged by law with the duty of making [tax] assessment[s]" had no standing in federal court to challenge constitutionality of state exemption statute; county auditor "had no personal interest in the litigation" and "was testing the constitutionality of the law purely in the interest of third persons, *viz.*, the taxpayers . . . .").

**B**

The real parties in interest in this litigation are the taxpayers of the plaintiff school districts. The school districts have no constitutional right under article VIII, section 1–e to "meaningful discretion." *Cf. Robbins v. Limestone County*, 114 Tex. 345, 268 S.W. 915, 917 (1925) (holding that county has standing to file suit to protect its constitutionally recognized property interests); *Milam County v. Bateman*, 54 Tex. 153, 165–66 (1880) (same). Therefore, they have not "suffered some actual or threatened injury as a result of the putatively illegal conduct" of the State. Thus, the plaintiffs have no standing to seek a declaration that the "statutory cap

---

1. *Cf.* Theresa M. Gegen, Note, *Standing on Constitutional Grounds in Texas Courts: Effect of* Texas Association of Business v. Texas Air Control Board, 47 BAYLOR L.REV. 201, 220–21 (1995) (concluding that "the Texas Su-

preme Court leaves undefined how far Texas courts should go when looking to federal standards for guidance in dealing with standing issues").

on M & O tax rates constitutes an unconstitutional statewide ad valorem tax." *See Agar Sch. Dist. No. 58–1 v. McGee*, 527 N.W.2d 282, 285 (S.D.1995) (school district lacked standing to challenge validity of property tax levy because it was not a taxpayer and had failed to establish any other "actual or threatened injury").

The plaintiffs' lack of standing is confirmed by a review of the judicial relief available for the alleged constitutional violation. The Court cannot restore the school districts' "meaningful discretion" (and, in substance, increase taxes and reduce constitutionally mandated equity) by eliminating the $1.50 statutory cap or increasing it to $1.75, $2.00, or some higher amount. *See County Sch. Trs. v. Dist. Trs.*, 137 Tex. 125, 153 S.W.2d 434, 439 (1941) (because it could not "be said that the Legislature would have passed any part of the [unconstitutional school law] with the invalid portion eliminated," the entire law was void). In addition, the Court cannot restore the "meaningful discretion" of the plaintiffs in this case by lowering either the constitutional general diffusion of knowledge standard or the statutory accreditation standards. The only available remedy for a proven violation of article VIII, section 1–e is an order enjoining the collection of the unconstitutional state ad valorem taxes.[2] Such an order would not restore the school districts' "meaningful discretion." Because the alleged injury would not be "redressed by a favorable decision," the plaintiffs lack standing. *See Town of Acton v. McGary*,

356 A.2d 700, 707–08 (Me.1976) (political subdivisions' claims dismissed because they were not taxpayers and "even if the State property tax were to be held unconstitutional in this litigation, such interests as the plaintiff municipalities may legitimately here assert as deserving of protection remain legally unaffected").

Finally, the plaintiffs' first amended original petition discloses the true purpose of the lawsuit:

Accordingly, Plaintiffs request that the Court enter a judgment declaring that the $1.50 statutory cap on M & O tax rates constitutes an unconstitutional statewide ad valorem tax. This constitutional deficiency cannot be cured simply by raising the statutory cap, because such a solution would only aggravate the State's overreliance on local property taxes as a means of financing the school system. Rather, Plaintiffs request that the State assume a greater responsibility for financing the school system and end its overreliance on the local property tax.

This Court is not empowered, as a remedy for a proven violation of article VIII, section 1–e, to order the State to "assume a greater responsibility for financing the school system." The plaintiffs do not contend otherwise.

The plaintiff school districts lobbied the 77th Legislature for increased education funding. When the Legislature failed to appropriate the plaintiffs' desired level of funding, they filed this suit.[3] The request-

---

**2.** Without addressing its relevance to standing, the district court noted this fact: "Under the plaintiffs' theory, what is invalid is the tax itself, not the cap.... If the plaintiffs' complaint is that the Legislature has itself levied an ad valorem tax, then the only remedy is to prohibit the collection of the tax." Modified Final Order at 34.

**3.** In the district court, the plaintiffs' attorney stated:

You know what they offered us? They said, But I tell you what, George, we'll give you an interim committee.... They said it's not on our agenda, there are other things, legislative redistricting. There are other things that they would choose to do rather than

ed judicial declaration is sought to force the Legislature to raise an additional two or three billion dollars a year in tax revenue for primary and secondary education.[4]

The plaintiffs do not seek to vindicate the rights of the taxpayers in their districts. Rather, these political subdivisions have invoked the jurisdiction of Texas courts to obtain a judicial declaration that will enhance their bargaining position with the Legislature. Under these circumstances, the policy concerns that·undergird both the separation of powers and standing doctrines are strongly implicated.

I would hold that the plaintiff school districts lack standing to seek the requested declaration.

### C

The Court's response regarding this issue reveals that Texas does not have much of a standing doctrine. The Court fails to discuss how its announced standing rule relates to either the separation of powers doctrine or the Texas open courts provision and, in a conclusory analysis, essentially holds that a political subdivision that is affected by a statute in any manner may

challenge its constitutionality in Texas courts.

It is true that the State has not challenged the plaintiffs' standing to sue. However, this Court is not authorized to issue advisory opinions at the request of parties who lack standing. *Tex. Ass'n of Bus.*, 852 S.W.2d at 444. Moreover, the Court has a constitutional duty to confirm that it has subject matter jurisdiction. *Republic of Tex. v. Laughlin*, Dallam 412 (Tex.1841) ("Before we are permitted to decide the several points made in this case, we feel it to be our duty first to dispose of a preliminary question; and that is, 'whether the record and proceedings before us make out a proper case for the interposition and decision of this Court.'"), *cited with approval in Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 647 (1933).

The Court correctly notes that standing was not an issue in *Edgewood I, Edgewood II, Edgewood III,* or *Edgewood IV.* However, in each of those cases, several plaintiffs clearly had standing; therefore, whether the school districts had standing was not material to the proper resolution of the case. *See Bd. of Educ. v. Walter,* 58

---

deal with this. And that's why the courts have been brought into....

4. The plaintiffs' attorney and court had this dialogue:

Attorney: I want to make this point clear to the Court right now—that what we're not here for—we can actually tell you from our pleadings what we're here for....

Court: How much would it cost?

Attorney: Well, we've done—it's hard to say, but—

Court: It's not hard to say. We can say exactly. If you go to $1.55 or $1.60, or $1.70, somebody can tell us exactly what it will cost.

Attorney: It's in the billions of dollars, between [$]2 and $3 billion.

Court: So—all right. Two and three billion. And what was the State budget this year?

Attorney: Well, they spent 30 billion on public education....

Court: That is the question. I mean, that's what Senator Ratliff probably asked you when you came over to talk to them. What are you going to cut? What are you going to raise? Where are you going to get $3 billion a year?

Attorney: ... [I]f we were to sit with Senator Ratliff today, I would tell him that we would have to seek additional resources. That might include a sales tax that was once tried and vetoed by Governor Clements. It could involve increased gasoline tax, it could involve an increase of severance taxes and it could involve a revisit of George Bush's business tax, which was later abandoned. Now, I am sure there are other things that could be done about additional resources....

Ohio St.2d 368, 390 N.E.2d 813, 826 (1979) (plaintiff students had standing to challenge state's public school finance system; court noted that question of whether plaintiff school board lacked standing was not dispositive, and therefore "the issue does not merit extended analysis"). In *Edgewood I*, *Edgewood II*, and *Edgewood IV*, article VII, section 1 of the Texas Constitution was at issue, and the plaintiffs included students (and their parents) who had standing to seek a declaration that the state's school finance system violated that provision. Similarly, in *Edgewood III* and *Edgewood IV*, article VIII, section 1–e was at issue, and several plaintiffs were taxpayers who had standing to seek a declaration that the system was unconstitutional.

The Court "see[s] no difference in the standing of an appraisal district to assert its claims in *Nootsie* and the standing of the school districts here." 107 S.W.3d at 583. However, there are material differences. The most important difference is that, unlike the appraisal district in *Nootsie*, the plaintiff school districts in this case are attempting to simultaneously represent groups that have conflicting interests. In addition to taxpayers, school districts represent their students and employees. Taxpayers generally prefer lower taxes, while students and employees generally prefer more education spending.

As a general rule, litigants should not be allowed to assert the rights of third parties. In this case, the plaintiffs represent groups with conflicting interests. And the real parties in interest, the districts' taxpayers, are capable of filing their own lawsuit if it is in their best interests. Accordingly, the plaintiff school districts should be denied standing to sue on behalf of their taxpayers. *Cf.* WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3531.11, at 25–26 (2d ed. 1984) ("In this setting, it may seem tempt-

ing to adopt by analogy the third-party standing doctrine that permits an association to borrow standing from injured members. Residual concerns of federalism and political theory, however, counsel against simply adopting this rule. Risks remain that a state may be choosing sides between different groups of citizens with conflicting interests, and may not represent the interests of the injured citizens as well as should be.").

At a minimum, because the plaintiffs' standing is unclear, the Court should have raised the issue sua sponte, requested supplemental briefing, and fully addressed it. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 443 ("Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing...").

The Court holds that the plaintiffs have standing. Despite my contrary view, I address other issues because of the public importance of this case.

## II

### Article VIII, Section 1–e

Article VIII, section 1–e was added to the Texas Constitution in 1968. It has been amended twice, once in 1982 and again in 2001. The section currently provides that "[n]o State ad valorem taxes shall be levied upon any property within this State." TEX. CONST. art. VIII, § 1–e.

### A

Before *Carrollton–Farmers Branch Independent School District v. Edgewood Independent School District*, 826 S.W.2d 489, 520 (Tex.1992) (*Edgewood III* ), no Texas court had ever "addressed a challenge brought under article VIII, section 1–e." With limited analysis of the text, purpose,

and history of the provision, this Court held:

> An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without *meaningful discretion.* How far the State can go toward encouraging a local taxing authority to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities. If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e. It is difficult, perhaps impossible, to define for every conceivable hypothetical precisely where along this continuum such taxes become state taxes. Therefore, if the Legislature, in an effort to remedy Senate Bill 351 with as few changes as possible, chose to inject some additional element of leeway in the assessment of the CED tax, it is impossible to say in advance whether that element would remove the tax from the prohibition of article VIII, section 1– e. Each case must necessarily turn on its own particulars. Although parsing the differences may be likened to danc-

ing on the head of a pin, it is the Legislature which has created the pin, summoned the dancers, and called the tune. The Legislature can avoid these constitutional conundra by choosing another path altogether.

*Id.* at 502–03 (emphasis added).

In *Edgewood Independent School District v. Meno,* 917 S.W.2d 717, 737–38 (Tex. 1995) (*Edgewood IV*), with no additional analysis of the text, purpose, or history of article VIII, section 1–e, the Court applied the aforementioned *Edgewood III* language and concluded inter alia that a school district would lack "meaningful discretion" if the so-called "ceiling" and "floor" became the same. In the pertinent paragraph, the Court stated:

> However, if the cost of providing for a general diffusion of knowledge continues to rise, as it surely will, the minimum rate at which a district must tax will also rise. Eventually, some districts may be forced to tax at the maximum allowable rate just to provide a general diffusion of knowledge. If a cap on tax rates were to become in effect a floor as well as a ceiling, the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable because the districts would then have lost all meaningful discretion in setting the tax rate.

*Id.* at 738.

**B**

In this case, it is undisputed that the ceiling is the $1.50 statutory cap and that the statutory accreditation standards serve as one measure of the floor. However, whether the constitutional general diffusion of knowledge standard is an alternative measure of the floor is sharply contested.

The State and the intervenors assert, and the courts below held, that school districts are forced to meet only the accreditation standards, and therefore the general diffusion of knowledge standard is irrelevant for purposes of article VIII, section 1–e. The plaintiffs assert and this Court holds that the floor may be either the accreditation standards or the general diffusion of knowledge standard. 107 S.W.3d at 581.

In its final order, the district court stated:

Thus, in determining whether the Legislature has imposed a state ad valorem tax, the only constitutionally relevant inquiry is whether the Legislature has compelled—directly by levy or indirectly by program mandate—a tax rate of $1.50. Regardless whether the Legislature should raise the accreditation standards, the districts are only legally required to meet those standards. Because the Legislature only compels a district to meet accreditation standards, the court must determine whether a tax rate cap has become a floor and a ceiling only by reference to the accreditation standards.

To escape the force of this logic, the plaintiffs seize upon the "general diffusion of knowledge" language in the "however" paragraph containing the changed-circumstances warning. Under this language, the plaintiffs seek to establish: 1) what educational program is necessary for a true general diffusion of knowledge, 2) what such a program costs, and 3) that it takes at least, if not more than, what the state now gives the districts plus what the districts can raise at a $1.50 tax rate.

In interpreting "a general diffusion of knowledge" in this way, the plaintiffs are taking the language out of context. In the "however" paragraph, the Supreme Court uses the term "general diffusion of knowledge" synonymously with the accreditation standards, not as a separate standard. The Court comes to this conclusion for two reasons.

First, as explained above, the logic of the Supreme Court's reasoning compels this conclusion. The school districts are under no legal obligation to fund what they may believe necessary in their hearts for a general diffusion of knowledge. The school districts are only legally obligated to fund what the Legislature has determined in the accreditation standards is required for a general diffusion of knowledge.

Second, the Supreme Court expressly says it is equating the accreditation standards with a general diffusion of knowledge. 917 S.W.2d at 730 n. 9. In *Edgewood IV*, when discussing a state ad valorem tax, the Supreme Court uses the terms interchangeably because it found that the Legislature had defined the one as the other.

Modified Final Order at 30–31. The court of appeals, with limited analysis, reached the same conclusion as the district court on this issue. *See* 78 S.W.3d 529, 536–39.

With no direct support, this Court concludes that "[t]he public school system the Legislature has established requires that school districts provide both an accredited education and a general diffusion of knowledge." 107 S.W.3d at 581. In substance, the Court holds that school districts have a legally enforceable duty to meet the constitutional standard imposed directly on the Legislature by article VII, section 1 of the Texas Constitution. That holding is inconsistent with several of this Court's constitutional precedents. *See, e.g., Webb County v. Bd. of Sch. Trs.*, 95 Tex. 131, 65 S.W. 878, 880 (1901) (article VII, section 1 "devolves the duty of establishing and maintaining public free schools upon the legisla-

ture, and shows that the function of such establishment and maintenance was to be performed by state agencies"); *El Dorado Indep. Sch. Dist. v. Tisdale*, 3 S.W.2d 420, 422 (Tex. Comm'n App.1928, judgm't adopted) (article VII, section 3 powers given Legislature as means to accomplish mandate of article VII, section 1, including authority to provide " 'for the management and control of the public school or schools of such districts,' " are "continuing, and in nature they are such as not to be delegable").

In addition, the conclusion that school districts have a legal obligation to satisfy duties imposed directly on the legislative branch by a state constitutional provision is inconsistent with the jurisprudence of other states. For example, in *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979), the School District of Philadelphia and parents of children attending the district's schools challenged the constitutionality of the state's public school finance system. The plaintiffs alleged that, in violation of article III, section 14 of the Pennsylvania Constitution,[5] the statutory funding scheme failed to provide the school district with adequate revenue. Holding that the school district lacked standing, the Court stated:

> It is obvious, however, that appellant School District of Philadelphia has failed to allege that it has suffered any legal harm from its projected financial deficit. The School District argues that it has a duty to provide a certain level of educational services which it cannot fulfill because of the effect of the statutory funding scheme. This argument must fail. The School District has no greater duty to provide education for the children of Philadelphia than the Legisla-

ture has delegated to it. It would be unreasonable to conclude that a greater duty has been delegated than that which the Legislature, through the statutory funding scheme, has provided the school district the means to fulfill.

*Id.* at 365 (citation omitted); *see also Roosevelt Elem. Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806, 813 (1994) ("[N]othing in art. XI prohibits the legislature from delegating some of its *authority* to other political subdivisions of the state to help finance public education. But there is nothing in art. XI, § 1 that allows the state to delegate its *responsibility* under the constitution.") (emphasis in original); *City of New York v. State*, 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649, 654 (1995) ("Surely, it cannot be persuasively argued that the [plaintiff school board and other municipal entities] should be held accountable either under the Equal Protection Clause or the State Constitution's public Education Article by reason of the alleged State underfunding of the New York City school system over which they have absolutely no control.") (citation omitted).

I would hold that the constitutional general diffusion of knowledge standard is relevant only to a challenge brought against the State under article VII, section 1 and, conversely, that the standard is irrelevant to a challenge brought solely under article VIII, section 1–e.

In its response regarding this issue, the Court offers nothing new. The reality is that school districts are required to meet only the statutory accreditation standards. The aspirational mission statement found at the beginning of the Education Code, and cited only in part by the Court, does not mention school districts. *See* TEX.

---

**5.** Article III, section 14 provides: "The General Assembly shall provide for the maintenance and support of a thorough and efficient

system of public education to serve the needs of the Commonwealth." PA. CONST. art. III, § 14.

EDUC.CODE § 4.001(a). And even if the mission statement is read to apply directly to school districts, the Court has referenced no means by which anyone may enforce it. How school districts, in the complete absence of any enforcement mechanism, are "forced" by either the Texas Constitution or the Education Code to comply with the constitutional general diffusion of knowledge standard remains unexplained.

## C

A review of *Edgewood III, Edgewood IV*, and the prior proceedings in this case leaves me with a firm conviction that the Court's "meaningful discretion" test must be reconsidered. The test is inflexible and incapable of easy application.[6] More importantly, it is only marginally tailored to the text, purpose, and history of article VIII, section 1–e. Finally, while this Court is obviously not required to follow precedents of other state courts, it is instructive that our decisions regarding article VIII, section 1–e differ significantly from the construction given similar provisions contained in other state constitutions.

In *Cramer v. Sheppard*, 140 Tex. 271, 167 S.W.2d 147 (1942), after reviewing the historical evidence concerning the constitutional provision at issue, the Court stated the following general principles of constitutional interpretation:

> The rule has long prevailed in this State that constitutional provisions should not be given a technical construction which would defeat their purpose. The meaning of a constitutional provision is fixed when it is adopted, and it is not different at any subsequent time. It should be construed in the light of the conditions existing at the time of adoption. We cannot question the wisdom of a constitutional provision. If the meaning of the language of a constitutional provision is plain, the courts must give full effect thereto, without regard to the consequences.

*Id.* at 154 (citations omitted).

In 1962, the Texas Commission on State and Local Tax Policy issued a legislatively mandated report on the state property tax. The influential report, which is widely credited with leading to the complete abolition of the state property tax, stated:

*Providing More Local Revenue*

Late in 1958, the Hale Aiken Committee of Twenty Four (established by the Legislature to make recommendations for improving public education) proposed that:

> "The State should make additional tax resources available to counties and to local school districts by withdrawing completely from the field of ad valorem taxation."

Speaking before the Texas Municipal League in October 1961, Governor Daniel said:

> "... it is my opinion that the time is near at hand when the State should step completely out of the ad valorem tax field and leave that source entirely to cities and other political subdivisions."

---

**6.** In addition to the proper measure of the floor, the parties and the courts below raise, debate, and ultimately disagree about several other issues regarding the "meaningful discretion" test. For example, the parties and the courts below have asserted or held that, for a school district to state a viable claim under article VIII, section 1–e, it must allege that all, something approaching or exceeding half, just some, or only one of the more than one thousand school districts in Texas have lost their "meaningful discretion." Such divergent opinions among highly qualified lawyers and judges indicates that the test is unsatisfactory.

Note that these statements do not say that abandonment of the State tax is the answer to all local fiscal problems; only that abandonment might give some of the more hard-pressed communities a little more fiscal elbow room.

It is a fact that most states that have abandoned the property tax as a source of State revenue have done so largely because they wished to allow local governments the exclusive use of this tax. In recent years nearly all of the states, and Texas has not been an exception, have greatly expanded their programs of State aid to local governments, particularly to local school districts. To many it seems anomalous for the State to collect large sums from the one tax source that most local governments have at their disposal and then distribute this back to the local governments in the form of grants-in-aid. Certainly if one purpose of the State aid program is to give relief to property taxpayers, this is an odd and contradictory way to accomplish the goal.

TEX. COMM'N ON STATE & LOCAL TAX POLICY, THE STATE PROPERTY TAX 10–11 (Dec.1962).

During this era, the most influential treatise on state and local taxation was Cooley's *The Law of Taxation.*[7] In that authority, the distinction between state taxes and local taxes, and the proper use of each, was described as follows:

A state purpose must be accomplished by state taxation, a county purpose by county taxation, and a public purpose for any inferior district by taxation of such district. This is not only just but it is essential. To any extent that one man is compelled to pay in order to relieve others of a public burden properly resting upon them, his property is taken for private purposes, as plainly and as palpably [as] it would be if appropriated to the payment of the debts or the discharge of obligations which the person thus relieved by his payments might owe to private parties. "By taxation," it is said in a leading case, "is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest. An act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of certain sums by one portion or class of people to another." This principle has met with universal acceptance and approval because it is as sound in morals as it is in law.

1 COOLEY, THE LAW OF TAXATION, § 314, at 653–54 (4th ed.1924) (footnotes omitted).

In 1967, the Legislature adopted a proposed constitutional amendment regarding the state property tax. The proposed amendment adding section 1–e to article VIII provided:

1. From and after December 31, 1978, *no State ad valorem taxes shall be levied upon any property within this State for State purposes* except the tax levied by Article VII, Section 17, for certain institutions of higher learning.

2. The State ad valorem tax authorized by Article VII, Section 3, of this Constitution shall be imposed at the following rates on each One Hundred Dollars ($100.00) valuation for the years 1968 through 1974: [setting forth a rate that declines in each of those years] and

---

**7.** For example, between 1954 and 1975, *The Law of Taxation* (4th ed.1924) was cited in ten of this Court's decisions.

*thereafter no such tax for school purposes shall be levied and collected. . . .*

Tex. S.J.R. 32, § 1, 60th Leg., R.S., 1967 Tex. Gen. Laws 2972 (emphasis added). The emphasized text reflects two important points: 1) the proposed amendment generally prohibited the levy of ad valorem taxes for "state purposes"; and 2) it provided for the gradual abolition of the state property tax for education.[8]

The proposed amendment adding section 1–e to article VIII was placed on the November 5, 1968 ballot. Before the election, the Texas Legislative Council[9] published an analysis of the proposed constitutional amendments. With regard to the state property tax amendment, the publication set forth the following arguments:

For:

1. The state ad valorem tax has long been the subject of attack on the basis that it is poorly and inequitably administered. Certainly, under-evaluation, evasion, and lack of uniformity in the assessment rate from county to county, among different kinds of property within the same county, and among individual owners of the same kind of property in the same county do exist in many instances. Adoption of the proposed amendment would overcome these inequities in keeping with the constitutional mandate that taxation be "equal and uniform." (Article VIII, Section 1)[.]

2. Complete abolition of the state ad valorem tax by gradual reductions over a period of years, as proposed by Amendment No. 7, would create no undue pressure on the state fiscal structure. *It would benefit counties and local subdivisions of the state, now finding it ever harder to meet growing government needs with present revenue sources, by making the ad valorem tax exclusively available to them.*

Against:

1. Phasing out of the ad valorem tax at a time when it is ever harder to obtain funds needed for state government operations, as proposed by Amendment No. 7, would necessitate an increase in other taxes, possibly the state sales tax, to provide compensating revenues. Tax experts are already predicting an increase in the present sales tax, and further increases, in view of the one percent levied by most Texas cities, would overburden those least able to pay.

2. The ad valorem tax, though it may sometimes be inequitably assessed, is drawn from those most able to pay. Abolition of the tax would inevitably benefit the "haves" at the expense of the "have nots."

TEX. LEG. COUNCIL, 14 PROPOSED CONSTITUTIONAL AMENDMENTS ANALYZED, at 24 (general election Nov. 5, 1968) (emphasis added).

---

8. The Legislature was clearly aware of the impact that the proposed amendment would have on education funding, both state and local. For example, the following amendments to S.J.R. 32 were defeated in the House: 1) "The loss in revenue to the Available School Fund resulting from the adoption of this Amendment to this Constitution shall be offset by a tax on incomes of both natural persons and corporations . . . ." H.J. OF TEX., 60th Leg., R.S. 2409 (1967); and 2) "As the ad valorem tax levied by the State is reduced as provided in Section 1–e of this Article the Legislature shall have authority by general law to authorize and empower local school districts to levy additional ad valorem taxes at the same rate as the state tax rate is reduced, such taxing authority to be in addition and cumulative of all other taxing authority now permitted such school districts." *Id.* at 2298.

9. The Texas Legislative Council is an agency of the legislative branch. *See generally* TEX. GOV'T CODE ch. 323.

The League of Women Voters of Texas prepared a similar analysis of the proposed amendments. With regard to the state property tax amendment, it stated:

For:

The state ad valorem tax, a subject of controversy for a long time, is wasteful, inefficient, and inequitable. Complete abolition of the state ad valorem tax by a series of gradual reductions would create no undue pressure on the state to find new sources of revenue. The proportion of total revenue receipts from ad valorem taxes has dropped steadily from .0301 cents per dollar in 1960 to .0242 in 1966. The ad valorem tax levied for general-revenue purposes was abolished in 1951.

*Abolition would benefit local governments struggling to meet growing demands for services on a limited tax base, by making the ad valorem property tax exclusively available to them.*

Against:

The phasing out of the state ad valorem tax at a time when Texas is constantly seeking new sources of revenue to meet the ever increasing cost of government could jeopardize the financial structure of the state.

The state ad valorem tax is paid by property owners, who are usually in a financial position to support public services. The creation of new sources of revenue would undoubtedly add to the burden of those least able to pay.

*14 Important Reasons to Vote,* AUSTIN AM.-STATESMAN, Nov. 3, 1968, at A10 (setting forth verbatim the analysis prepared by the League of Women Voters of Texas) (emphasis added).

The state's major newspapers also provided information regarding the proposed amendments. For example, the *Austin American–Statesman* reported:

One of the longstanding goals of Gov. John Connally's administration has been abolishment of the state ad valorem tax, and that issue is the basis for the seventh amendment on the ballot this year.

. . . .

The chief argument against the state ad valorem tax is that there can be no uniform or fair means of assessment of collection. Under-evaluation, lack of conformity and out-right evasion has long plagued this tax.

Adoption of the amendment, it is argued, would overcome these inequities and keep taxation "fair and uniform." *It also would make ad valorem taxes exclusively available to the cities and counties to aid in their financial burdens.*

Arguing against the amendment, it is pointed out phasing out this tax simply would mean another tax from another source to gain needed funds to operate state government.

It also is maintained the ad valorem tax is drawn from those most able to pay, and doing away with it would benefit the "haves" at the expense of the "have nots."

Jerry Hall, *Texas Voters Must Decide on Pollution, Tax Issues,* AUSTIN AM.-STATESMAN, Oct. 26, 1968, at 44 (emphasis added).

The proposed constitutional amendment adding section 1–e to article VIII passed by a vote of 1,251,528 to 700,078. The provision's original text and the available historical evidence establish that the principal purpose and intent of article VIII, section 1–e at the time of its adoption was to prohibit the levy of ad valorem taxes for state purposes, thereby leaving the property tax for the exclusive use of the state's political subdivisions. Historical evidence regarding the 1982 and 2001 amendments to article VIII, section 1–e reflects that

neither was intended to modify the provision's fundamental purpose and intent.[10]

### D

Nothing in the text or history of article VIII, section 1–e mandates that the level of state control over an ad valorem tax levy be absolute before the provision is violated. Thus, the Court's narrow construction of the provision, and the resulting "meaningful discretion" test, produces results that are inconsistent with the provision's text, purpose, and history.

For example, although they clearly conflict with the fundamental purpose and intent of article VIII, section 1–e, the wealth-equalization provisions contained in Chapter 41 of the Education Code have been found to pass constitutional muster under the Court's "meaningful discretion" test. *See Edgewood IV*, 917 S.W.2d at 737–39. *But see id.* at 757 n. 15 (Enoch, J., concurring & dissenting) (concluding that the system violates article VIII, section 1–e and stating that "[w]hat is determinative is that the State mandates the local tax and uses the revenues thus generated for state purposes"); *id.* at 765 (Hecht, J., joined by Owen, J., concurring & dissenting) (concluding that the system violates article VIII, section 1–e and noting that "[t]he State's control of redistributing local revenues is no different than it was under Senate Bill 351").

A Legislative Budget Board publication describes the wealth-equalization provisions as follows:

> For the 2001–2002 school year, districts with per pupil property wealth that ex-ceeds $300,000 are able to generate more than $30.00 per WADA per penny of tax effort without state assistance. These districts are often referred to as "Chapter 41 Districts." This ability to raise more revenue per tax effort is capped, however. In 1993 Senate Bill 7 established the "share the wealth" provision. Statute [sic] requires districts with per pupil property values that exceed $300,000 to share their wealth by choosing one of the following five "recapture" options:
>
> 1. Consolidate with another (poorer) district.
>
> 2. Detach property to another school district for taxation purposes.
>
> 3. Purchase average daily attendance credits from the state. The cost of a credit depends on a calculation that approximates the amount of tax revenue raised per child in the Chapter 41 District.
>
> 4. Contract for the education of non-resident students (partner with a poorer district). The cost of educating a non-resident depends on a calculation that approximates the amount of tax revenue raised per child in the Chapter 41 district.
>
> 5. Consolidate its tax base with one or more other districts.
>
> The two most commonly employed choices are buying attendance credits from the state (writing the state a check), or sharing revenue with another district (writing a district a check). In the 2001–02 school year, there are 101

---

10. *See* Tex. H.J.R. Res. 1, § 1, 67th Leg., 2d C.S., 1982 Tex. Gen. Laws 52; TEX. LEG. COUNCIL, ANALYSES OF PROPOSED CONSTITUTIONAL AMENDMENTS APPEARING ON NOVEMBER 2, 1982 BALLOT, at 7 (purpose of proposed amendment to article VIII, section 1–e was to eliminate the $.10 state property tax for certain institutions of higher learning); Tex. H.J.R. Res. 75, § 5.02, 77th Leg., R.S., 2001 Tex. Gen. Laws 6718; TEX. LEG COUNCIL, ANALYSES OF PROPOSED CONSTITUTIONAL AMENDMENTS. at 83 (general election Nov. 6, 2001) (purpose of proposed amendment to article VIII, section 1–e was to eliminate expired, and therefore unnecessary, transition provision).

Chapter 41 districts. The associated recapture revenue realized by the state is anticipated to total $1.31 billion in the 2002–03 biennium.

. . . .

Almost all districts that have been subject to recapture since 1995 have elected to apply options (3) purchasing attendance credit from the state; or (4) contract for the education of non-resident students. (The one exception is the Tuloso Midway ISD, which deeded industrial property to Corpus Christi ISD in 1993—Option 2).

TEX. LEG. BUDGET BD., FINANCING PUB. EDUC. IN TEX. KINDERGARTEN THROUGH GRADE 12 LEGISLATIVE PRIMER, at 23–34 (3d ed.2001).

In its final order in the *Edgewood IV* litigation, the district court stated: "[T]he *Love* analysis supports counting recaptured dollars as state aid as discussed at page 23. These dollars were obtained by the state in a trade with the property-rich districts. They are now properly characterized as state dollars." Revised Opinion at 32. Similarly, the Texas Education Agency publication *Snapshot 2000* states: "Beginning with the 1993–94 school year, state revenue also includes revenues collected from districts exercising one of the wealth equalizing options. . . . These local tax dollars were redistributed as state aid." TEX. EDUC. AGENCY, SNAPSHOT 2000: 1999–2000 SCHOOL DISTRICT PROFILES, at 28–29 (2000) (included in the record as defendants' exhibit number one).

Under article VII, sections 1 and 3 of the Texas Constitution, the State and each school district share responsibility for funding the education of the district's students. Therefore, in Texas, the funding of primary and secondary education is generally a mixed state and local purpose. However, at a minimum, each Chapter 41 district fully satisfies its responsibility when it funds one hundred percent of the cost of educating its own students. In addition, this Court has held that a school district is constitutionally prohibited from funding the education of students who reside in other school districts. *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20, 27 (1931) ("Since the Constitution, art. 7, § 3, contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts, it is obvious that the education of nonresident scholastics is not within their ordinary functions as quasi-municipal corporations."). Thus, equalization among school districts of access to education funding is solely a state purpose. *See id.* at 26 ("[T]axes levied in school districts and cities for school purposes were and are levied for the benefit of the district or city, or the inhabitants thereof, and not for the school system of the state generally.").

The State is prohibited by article VIII, section 1-e from levying an ad valorem tax for any state purpose. Moreover, that provision was adopted in part to abolish the state property tax for education. Therefore, the Texas Constitution clearly prohibits the State from directly levying an ad valorem tax for the purpose of equalizing funding among school districts.

This Court has repeatedly held that the State may not accomplish indirectly what it is prohibited from doing directly. *See Edgewood III*, 826 S.W.2d at 503 ("[A]rticle VIII, section 1-e prohibits the State from doing indirectly through CEDs what it cannot do directly, that is, levy an ad valorem tax."); *Love*, 40 S.W.2d at 27 ("[T]o say that the Legislature can compel a district to admit nonresidents without just compensation would be permitting that department to do indirectly what it admittedly cannot do directly."); *Jernigan v. Finley*, 90 Tex. 205, 38 S.W. 24, 26 (1896) ("The legislature cannot do by indirection what it cannot do directly.").

The manifest intent and effect of Chapter 41 of the Education Code is to divert local ad valorem taxes to the state treasury and to use those funds to accomplish what is solely a state purpose. Accordingly, the wealth-equalization provisions in Chapter 41 of the Education Code violate article VIII, section 1–e. *Cf. Love*, 40 S.W.2d at 28 (power of the Legislature over school district property is not "absolute or unlimited" and "though such property is subject to very broad legislative legislation, its confiscation or diversion is prohibited by both the federal and state Constitutions"); *Buse v. Smith*, 74 Wis.2d 550, 247 N.W.2d 141, 155 (1976) (holding recapture component of state's public school finance system unconstitutional, court stated that "the state cannot compel one school district to levy and collect a tax for the direct benefit of other districts, or for the sole benefit of the state").

This conclusion is consistent with the Court's analysis in *Edgewood II* regarding the interplay of the relevant constitutional provisions:

> On motion for rehearing, plaintiff-intervenors request that we modify our opinion to overrule *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931), or interpret that case "in a manner that would permit the [state-wide] recapture of local ad valorem revenues for purposes of equalization." We believe *Love* is sound and decline to overrule or modify it. Moreover, the interpretation requested by plaintiff-intervenors would violate the Texas Constitution. Accordingly, we overrule the motion for rehearing.
>
> In *Love*, this Court held that the City of Dallas could not be compelled to educate students who resided outside of the city's school district. We held that article VII, section 3 of our Constitution only "contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts." 120 Tex. at 367, 40 S.W.2d at 27.
>
> . . . .
>
> Our Constitution clearly recognizes the distinction between state and local taxes, and the latter are not mere creatures of the former. The provision that "[n]o State ad valorem taxes shall be levied upon any property in this State," TEX. CONST. art. VIII, § 1–e, prohibits the Legislature from merely recharacterizing a local property tax as a "state tax." Article VII, section 3, however, states that "the Legislature may authorize an *additional* ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the *further* maintenance of public free schools, and for the erection and equipment of school buildings *therein*." TEX. CONST. art. VII, § 3, (emphasis added). These constitutional provisions mandate that local tax revenue is not subject to state-wide recapture.

*Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 499 (Tex.1991) (*Edgewood II*) (opinion on rehearing).

The poor correlation between the text, purpose, and history of article VIII, section 1–e and the implementing test created by this Court in *Edgewood III* and *Edgewood IV* reflects that the test should be abandoned or, at a minimum, substantially modified.

**E**

Several other states have constitutional prohibitions similar to article VIII, section 1–e of the Texas Constitution, yet none of those states determines whether a tax is improper by examining the political subdivision's "meaningful discretion" or the control exercised by the state over the act of taxation itself. Rather, in these states, whether a tax is an unconstitutional state

ad valorem tax depends on whether the tax serves state or local purposes.

The Oklahoma Constitution provides that "[n]o ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes." OKLA. CONST. art. X, § 9(a). To ensure that local ad valorem taxes are used exclusively for local purposes, this provision makes clear that no part of the tax money may be allocated for the benefit of the state. The Oklahoma Supreme Court has concluded that "[w]hether Article 10, Section 9, is being violated depends upon whether county funds are being spent for a State, rather than a county, purpose." *State ex rel. Dep't of Human Servs. v. Malibie*, 630 P.2d 310, 316 (Okla.1981). The court has consistently applied that test to determine whether an ad valorem tax violates section 9(a). *See, e.g., State ex rel. Jordan v. City of Bethany*, 769 P.2d 164 (Okla.1989) (holding that article X, section 9 prohibited legislatively directed cost-of-operations sharing for performance of autopsies as part of felony homicide prosecutions, an exclusive state service and duty, because the legislature was attempting to divert municipal and county revenues to assist in the funding, or partial funding, of state services); *see also Pease v. Bd. of County Comm'rs*, 550 P.2d 565 (Okla.1976); *St. Louis–San Francisco Ry. Co. v. Tillman County Excise Bd.*, 201 Okla. 624, 208 P.2d 576 (1949); *Excise Bd. v. Chicago, R.I. & P. Ry. Co.*, 168 Okla. 523, 34 P.2d 268 (1934). In fact, the court has concluded that the state may regulate the process by which the county raises and distributes ad valorem tax revenue so long as it does not allocate any portion of that revenue for state purposes: "The county is governed by state law in the manner in which it raises and distributes ad valorem tax revenue. While the state can regulate this process, it cannot—because of express constitutional prohibition—allocate ad valorem tax revenue for the benefit of the state." *Bd. of County Comm'rs v. City of Muskogee*, 820 P.2d 797, 805 (Okla.1991), *overruled on other grounds by Clay v. Indep. Sch. Dist. No. 1*, 935 P.2d 294 (Okla.1997). Thus, the purpose of the tax, not the state's degree of control over the taxation process, is determinative.

The Nebraska Constitution provides that "[t]he state shall be prohibited from levying a property tax for state purposes." NEB. CONST. art. VIII, § 1A. The Nebraska Supreme Court has noted that "[t]he purpose of this section was to require the state, after the adoption of sales and income taxes, to leave the realm of property taxation." *Swanson v. Dep't of Educ.*, 249 Neb. 466, 544 N.W.2d 333, 340 (1996); *see also Craig v. Bd. of Equalization*, 183 Neb. 779, 164 N.W.2d 445, 448 (1969) ("The meaning of the constitutional prohibition is related to the national scene of state-local relations."). The court recognized that "[f]unding most, if not all, county functions has served state purposes" and "[f]ederal, state, and local governments have joined to combat conditions of common concern" such that "conceptual stratification of operations by state and local governments seems ill-suited to the reality of vertical integration." *Craig*, 164 N.W.2d at 448. Nevertheless, the court confirmed that "stratification is the central arch of the constitutional prohibition." *Id.* Thus, the court has concluded that whether a property tax is constitutional turns "on a determination of whether the controlling and predominant purposes are state purposes or local purposes." *State ex rel. W. Neb. Technical Cmty. Coll. v. Tallon*, 192 Neb. 201, 219 N.W.2d 454, 460 (1974).

Because the focus lies on the purpose of the tax, the Nebraska Supreme Court has

determined that "[t]he levy of a property tax by a local governmental unit should not be treated as a state levy for state purposes merely because the Legislature has authorized or required the local governmental unit to make the levy." *R R Realty Co. v. Metro. Utils. Dist.,* 184 Neb. 237, 166 N.W.2d 746, 748 (Neb.1969). Conversely, the court has also held that "where the Legislature has authorized and required local governmental units to make a property tax levy for state purposes, it should not be treated as a local levy for local purposes merely because it is made by a local governmental unit." *Tallon,* 219 N.W.2d at 460. In other words, "the Legislature cannot circumvent an express provision of the Constitution by doing indirectly what the Constitution prohibits it from doing directly." *Rock County v. Spire,* 235 Neb. 434, 455 N.W.2d 763, 770 (1990).

The Florida Constitution provides that "[n]o state ad valorem taxes shall be levied upon real estate or tangible personal property." FLA. CONST. art. VII, § 1(a). Ad valorem taxation is expressly left to political subdivisions for local purposes: "Counties, school districts, and municipalities shall, and special districts may, be authorized by law to levy ad valorem taxes and may be authorized by general law to levy other taxes, for their respective purposes...." *Id.* § 9(a). The Florida Supreme Court has held that the "overriding purpose" of article VII, section 1(a) "is to make a constitutional division of tax revenues between those available for state uses and those reserved for local government." *Alachua County v. Adams,* 702 So.2d 1253, 1254 (Fla.1997). To further that purpose, the court has made it clear that "the legislature may not circumvent the prohibition of state ad valorem taxation by any scheme or device which requires local ad valorem taxes and then channels the proceeds into essentially state functions which

are not also local functions." *Bd. of Pub. Instruction v. State Treasurer,* 231 So.2d 1, 4 (Fla.1970). Thus, in deciding whether a tax amounts to a state ad valorem tax prohibited by article VII, section 1(a), the court has held that "[t]he determinative question is whether the ad valorem tax receipts are used to further a local purpose." *St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Florida, Inc.,* 421 So.2d 1067, 1070 (Fla.1982).

Although their constitutions have provisions similar to article VIII, section 1–e of the Texas Constitution, these states have no test like our "meaningful discretion" test and have instead focused on the purpose of the ad valorem tax to determine whether it is constitutional. Given the similarity of language and intent that those provisions have to article VIII, section 1–e, the court decisions interpreting those provisions provide additional evidence that this Court should abandon its current "meaningful discretion" test and adopt an approach that focuses on the purpose of the disputed ad valorem tax.

### F

In light of the foregoing analysis, the Court should have requested that the parties brief the following question: Whether the interpretation of article VIII, section 1–e of the Texas Constitution adopted by the Court in *Edgewood III* and *Edgewood IV* should be reconsidered?

High courts have inherent authority to, sua sponte, raise legal issues that are important to the proper resolution of a pending case and to request briefing thereon. *See, e.g., Patterson v. McLean Credit Union,* 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988) (per curiam) (case restored to calendar for reargument and parties requested to brief question of whether precedent should be overruled). In addi-

tion, both this Court and the United States Supreme Court have consistently held that the doctrine of stare decisis has limited application in the area of constitutional interpretation.

For more than a century, this Court has recognized that the rule of stare decisis is not absolute and that its force varies depending on the context. In *Willis v. Owen*, 43 Tex. 41 (1875), the Court considered the constitutionality of a statute under which a de facto statewide property tax of one percent had been levied for school purposes. Although it acknowledged that the constitutionality of the statute had been upheld in prior decisions of the Court and that "[i]t may, therefore, be thought that the question should not be regarded by us as now open for discussion," the Court nevertheless ruled the statute unconstitutional. The Court explained that stare decisis could not dictate the outcome of the case because of the nature of the issues involved:

> We cannot, however, regard the rule of *stare decisis* as having any just application to questions of the character involved in these cases. This doctrine grows out of the necessity for a uniform and settled rule of property, and definite basis for contracts and business transactions. If a decision is wrong, it is only when it has been so long the rule of action, as that time and its continued application as the rule of right between parties demands the sanction of its error. Because, when a decision has been recognized as the law of property, and conflicting demands have been adjusted, and contracts have been made with reference to and on faith of it, greater injustice would be done to individuals, and more injury result to society by a reversal of such decision, though erroneous, than to follow and observe it. But when a decision is not of this character, upon no sound principle do we feel at

liberty to perpetuate an error, into which either our predecessors or ourselves may have unadvisedly fallen, merely upon the ground of such erroneous decision having been previously rendered.

> The questions to be considered in these cases have no application whatever to the title or transfer of property, or to matters of contract. They involve the construction and interpretation of the organic law, and present for consideration the structure of the government, the limitations upon legislative and executive power, as safeguards against tyranny and oppression. Certainly, it cannot be seriously insisted, that questions of this character can be disposed of by the doctrine of *stare decisis*. The former decisions of the court in such cases are unquestionably entitled to most respectful consideration, and should not be lightly disregarded or overruled. And in case of doubtful interpretation, a long-settled and well-recognized judicial interpretation, or even legislative or executive construction within the sphere of their respective functions, might be sufficient to turn the balanced scale. But in such case the former decision or previous construction is received and weighed merely as an authority tending to convince the judgment of the correctness of the particular conclusion, and not as a rule to be followed without inquiry into its correctness.

*Id.* at 48–49.

Twenty years later, the Court revisited the rule of stare decisis and its application to constitutional issues. In its decision in *Higgins v. Bordages*, 88 Tex. 458, 31 S.W. 52 (1895), the Court overruled a decision after concluding that it conflicted with a constitutional provision exempting homesteads from forced sale for the payment of

assessments for local improvements. On rehearing, the Court examined its departure from precedent, framing the issue as follows: "Shall we uphold the constitution as it was made by the sovereign power of the state of Texas, or shall we uphold a decision of the supreme court, itself a creature of the constitution?" *Higgins v. Bordages*, 88 Tex. 458, 31 S.W. 803, 804 (1895) (opinion on rehearing). The Court chose to overrule precedent, because to do otherwise "means to disregard the constitution, as we understand its provisions, and in our judgment would deprive citizens of a constitutional protection, provided by a convention representing the sovereign power of the state, which had the right to determine the policy of this state with regard to this question." *Id.* at 805.

The United States Supreme Court has also held that stare decisis cannot compel the outcome on constitutional questions. In *Smith v. Allwright*, 321 U.S. 649, 665, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the Court noted that it was "not unmindful of the desirability of continuity of decision in constitutional questions," but nevertheless recognized long-standing practice that the Court may "freely exercise" its power to reexamine the basis of its constitutional decisions:

> [W]hen convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions. This has long been accepted practice, and this practice has continued to this day. This is particularly true when the decision believed erroneous is the application of a constitutional principle rather than an interpretation of the Constitution to extract the principle itself.

*Id.* at 665–66, 64 S.Ct. 757 (footnotes omitted). In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Court again acknowledged that stare decisis is not absolute, especially in constitutional cases: "*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.' This is particularly true in constitutional cases, because in such cases 'correction through legislative action is practically impossible.'" *Id.* at 828, 111 S.Ct. 2597 (citations omitted); *cf. Dickerson v. United States,* 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (stating that "stare decisis is not an inexorable command, particularly when we are interpreting the Constitution," but refusing to overrule precedent).

In *Texas Association of Business v. Texas Air Control Board,* 852 S.W.2d 440 (Tex.1993), this Court overruled an important constitutional precedent. With regard to the applicability of stare decisis in the constitutional context, the Court stated that "[a]lthough our concern for the rule of stare decisis makes us hesitant to overrule any case, when constitutional principles are at issue this court as a practical matter is the only government institution with the power and duty to correct such errors." *Id.* at 446.

It is clear that the stare decisis doctrine does not prevent the Court from reconsidering its "meaningful discretion" test.

## G

With regard to whether the "meaningful discretion" test should be reconsidered, the Court responds that: "We find nothing in the text or history of article VIII, section 1–e to require that a state tax be determined by its purpose rather than by the extent of state control over its em-

ployment. Nor are we clear how such a purpose-oriented standard would operate." 107 S.W.3d at 585. As to the first statement, the foregoing analysis proves otherwise. The second statement raises a legitimate concern. However, Oklahoma, Nebraska, and Florida have each been able to develop and consistently apply a purpose-oriented standard. In contrast, this Court has accurately described the difficult task of applying its "meaningful discretion" test: "Each case must necessarily turn on its own particulars. Although parsing the differences may be likened to dancing on the head of a pin...." *Edgewood III*, 826 S.W.2d at 503. In any event, the Court's role is not to question the wisdom of a constitutional provision, but simply to apply it. *See Cramer*, 167 S.W.2d at 154.

Justice Douglas stated: "A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written. But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it." Douglas, *Stare Decisis*, 49 COLUM. L.REV. 735, 736 (1949). I agree and, therefore, would replace the current "meaningful discretion" test with a purpose-oriented standard. To adhere to the Court's contrary holdings in *Edgewood III* and *Edgewood IV* would require me to disregard the fundamental purpose and intent of article VIII, section 1–e as I understand it, and would deprive Texas taxpayers of their constitutional rights. *See Higgins*, 31 S.W. at 805.

### III

### Article VII, Section 1

The Court's insistence on importing the general diffusion of knowledge standard of Article VII, section 1 of the Texas Constitution into Article VIII, section 1–e neces-

sitates a discussion of that standard. However, because this appeal is being determined on an expedited basis, I am unable to fully address this important issue.

The Court continues to broadly interpret article VII, section 1 of the Texas Constitution. That provision requires the Legislature to "establish and make suitable provision for the support and maintenance of an efficient system of public free schools." TEX. CONST. art. VII, § 1. The Court's interpretation of article VII, section 1 will require it, sooner rather than later, to determine the qualitative level and cost of an "adequate education" for Texas schoolchildren. That determination is not only one the Court was not elected to make, it is also one the Court is ill-equipped to handle. In any event, the likely result will be a decision by this Court that the current level of primary and secondary funding is insufficient to meet the "constitutional mandate" of article VII, section 1. Of course, responsibility for funding the additional educational services ordered by the Court will fall to Texas taxpayers.

### IV

### Conclusion

The court of appeals dismissed all of the plaintiff school districts' claims. Because the plaintiffs lack standing to seek the requested judicial declaration, I would affirm the court of appeals' judgment.